**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| MORGAN A. BETTINGER,                              ) | |
|                                                   ) | |
|       Plaintiff,    ) | |
|                                                   ) | |
| v.                                                ) | |
|                                                   ) | |
| THE RECTOR AND VISITORS OF THE                    ) | |
| UNIVERSITY OF VIRGINIA (a/k/a and                 ) | |
| hereinafter referred to as "THE                   ) | |
| UNIVERSITY OF VIRGINIA"); THE                     ) | |
| BOARD OF VISITORS; RECTOR                         ) | |
| ROBERT D. HARDIE; VICE-RECTOR                     ) | CIVIL ACTION NO. 3:23-cv-00041 |
| CARLOS M. BROWN; ROBERT M.                        ) | |
| BLUE; MARK T. BOWLES;                             ) | **JURY TRIAL DEMANDED** |
| ELIZABETH M. CRANWELL; THOMAS                     ) | |
| A. DEPASQUALE; U. BERTRAM                         ) | |
| ELLIS, JR.; PAUL C. HARRIS; BABUR                 ) | |
| B. LATEEF, M.D.; STEPHEN P. LONG,                 ) | |
| M.D.; PAUL MANNING; JAMES B.                      ) | |
| MURRAY; JOHN L. NAU; THE                          ) | |
| HONORABLE L.F. PAYNE; AMANDA                      ) | |
| L. PILLION; RACHEL W. SHERIDAN;                   ) | |
| DOUGLAS D. WETMORE; JAMES E.                      ) | |
| RYAN; and ALLEN W. GROVES,                        ) | |
|                                                   ) | |
|       Defendants.   ) | |
|                                                   ) | |

## COMPLAINT

COMES NOW PLAINTIFF Morgan Alyse Bettinger, through undersigned counsel, who hereby

avers, alleges, and complains of the Defendants as follows:

### I. NATURE OF THE ACTION[1]

1.    This lawsuit is a civil action sounding in civil rights deprivations by a major public

University and its most senior leadership in which the Plaintiff seeks redress in the form of

---

[1]    "Ignorance & bigotry, like other insanities, are incapable of self-government." Thomas Jefferson, corresponding with the Marquis de Lafayette, Monticello, Virginia, May 14, 1817.

a declaratory judgment, injunctive relief, attorneys' fees and costs, and, as to certain Defendants, an award of compensatory and punitive damages.

2.      On the evening of July 17, 2020, the mob came for Morgan Bettinger.

3.      Less than forty-eight hours later and over the course of the next thirteen months and beyond, the Defendant University of Virginia and its most senior leaders – leaders who owed Morgan a duty to protect her "best interests" – would, without any legal or evidentiary basis, join in, augment, amplify, and then take the lead in a racially motivated campaign to ruin Morgan Bettinger, depriving her of her most fundamental, clearly established constitutional rights and causing her irreparable harm and significant emotional, physical, reputational, and financial damages in the process.

4.      This entire controversy – from the racial harassment, death threats and demands for ostracization and banishment to the Defendants' cynical, calculated, and racially motivated persecution – rests entirely on a hoax by a teenaged college freshman, a self-proclaimed "racial justice activist," just because of the color of the Plaintiff's skin.

5.      As the sun was setting on the evening of July 17, 2020, Plaintiff Morgan Bettinger, on her way home from working a twelve-hour day, encountered an anti-police protest that had, after disrupting businesses and diners in downtown Charlottesville, Virginia, completely blocked traffic on a main thoroughfare and all possible detour streets on her only route home. Morgan exited her vehicle, approached a White male who was sitting in the driver's seat of a City of Charlottesville dump truck entirely blocking the main road, exchanged pleasantries, and then, seeing a large group of black-clad protesters lying, kneeling, and sitting in the tree-lined road, at dusk, up ahead on the other side of the large truck, said

fifteen words: "Well, it's a good thing you're here because otherwise they could be made speed bumps."[2]

6.     Fifteen words.

7.     The words are entirely innocuous and innocent, and no reasonable, objective person could ever conclude otherwise. The words are not "violence." The words are not "harmful." The words pose no "risk." The words do not constitute a "true threat" as that term is defined by applicable Supreme Court precedent, and every Defendant knew this then and knows this now.

8.     Morgan Bettinger didn't speak the words to anyone but the White truck driver. She spoke in a calm, casual, and cordial manner, smiling and friendly. No one was standing near her, and the Plaintiff did not believe she could be heard by anyone other than the driver. She did not convey a threat, she did not threaten anyone, and she did not intend to threaten anyone.

9.     What Morgan Bettinger did was state a fact in an entirely pleasant manner: the protesters, sitting, kneeling, and lying in the middle of a usually busy street as the sun was setting, with no barricades, no police presence of any kind, no notice or warning to drivers, could have been struck by a car if the large dump truck that totally blocked traffic were not there.

10.     *"Good thing"* . . . *"could"* . . .

11.     These words cannot be reasonably construed as a threat.

12.     But, as shown below, solely because of the color of the Plaintiff's skin, that's exactly what happened.

---

[2]     The Defendants' own investigators and administrators found that these were the words used by the Plaintiff when they "officially" concluded, in writing, that Morgan Bettinger was innocent and had not threatened anyone, including the teenager.

13.   The teenager concocted a racial hoax, claiming that the Plaintiff threatened her and did so in a racist manner. The teenager would later admit to the University's professional investigators that she never even heard Morgan Bettinger speak and that her accusations against the Plaintiff may have been based "on something she 'misheard'" from one of her fellow protesters.

14.   Undaunted by the thorough falsity of her accusation, the teenager initiated a campaign of harassment, bullying, and cyber-stalking, including actual, written death threats and "doxxing" of the Plaintiff and her family. The teenager issued a "Call to Action" to her thousands of followers and massive "platform," imploring them to follow her lead and unleash a torrent of false complaints against the Plaintiff with the University of Virginia, demanding Morgan's expulsion.

15.   The death threats were graphic, serious, and frightening: One of the teenager's local followers promised to "torch her fucking car" with Morgan inside it.

16.   Rather than deploying the vast, substantial array of resources available for Morgan's protection, Defendants the University of Virginia, Ryan and Groves, for no reason other than the color of her skin, turned their backs on Morgan and join forces with the teenager.

17.   Within days, the vast and potent University apparatus was mobilized against Morgan: Multiple investigations were initiated. Multiple official "condemnations" of Morgan and her speech were broadcast to well over 100,000 members of the University community, including Morgan's classmates, teachers, and the people who would be directed by the University to investigate and judge Morgan.

18.   The Defendants subjected Morgan to thirteen months of sheer Hell: They humiliated her. They placed her in daily fear of physical violence. They filled her with constant dread and

despair. They initiated three separate and lengthy investigations of her, with attendant interrogations and proceedings. They constructively suspended and expelled[3] her from school. They ostracized her from all aspects of student and community life. They forced her to meet with professors who had "unconditionally condemn[ed]" Morgan in communications to her entire department, including students who had been called upon to investigate Morgan. Morgan was not included in her program's degree ceremonies. Morgan was excluded from University social events and graduation celebrations. They banned her from attending "live" classes, held on Zoom, where she could participate in class discussion, forcing her to take instruction "asynchronously," meaning watching pre-recorded lectures on YouTube without the opportunity for class participation. They told her that if she was too afraid to come to the University, she should stay home. They refused her request for an escort when she was on campus. They told her that if she absolutely needed to come to the University's "Grounds," she should wear a "gator" style mask covering her entire face, sunglasses, and a hat with her hair pulled back to avoid being recognized. They took away the life of a college senior that Morgan reasonably expected to enjoy and to which she was entitled. They took away the sunny future of a UVa graduate, which Morgan reasonably expected to be hers after years of hard work and to which she was entitled, and they exchanged it with a future that is forever clouded, gloomy, and bleak. They publicly branded her a "racist," "disgusting," "a terrorist," and a "threat." They called her "shameful." They publicly "condemned" her, again and again. They made her a pariah

---

[3] The University will claim that Morgan was "only" "expelled in abeyance." However, the University has refused to expunge or remove Morgan's expulsion "in abeyance" or any "Disciplinary Expulsion" notations from Morgan's permanent student record. As far as the world knows, Morgan was "expelled" from the University.

in her own hometown, in the University community, and everywhere the University's tentacles of influence extend.

19.   Morgan was utterly deprived of the benefits, privileges, terms, and conditions of the University experience she had earned, paid for, and deserved. For 390 days in a row, from July 17, 2020, to August 10, 2021, Morgan was subjected to the daily fear that the college degree she had worked so hard and paid so much to earn would be withheld, withdrawn, rescinded, or tarnished. Morgan was then denied the benefits, privileges, terms, and conditions of a graduate or degree holder for which she had worked, paid, earned, and deserved. Morgan has lost good, well-paying jobs because of the Defendants' mistreatment of her. Morgan has had job offers rescinded because of the Defendants' mistreatment of her. Morgan is afraid to go into town because of what was done to her. Morgan never goes to the "Grounds" of the college she loved so much, once, and that she worked so hard to attend.

20.   For the past 1,107 days, with no end in sight, Morgan has awakened in state of anxiety and fear, a pit in her stomach – "will today be the day they burn me alive in my car?" "Will today be the day they hurt my mother?" "Will today be the day they change their mind and take away my degree, just as they've taken everything else?" "Will today be the day they humiliate me again?" Morgan suffers from severe and permanent mental, emotional, and psychological injuries and conditions as a direct, proximate, and entirely foreseeable result of the University's and Defendant Ryan's and Groves' mistreatment of her. These include an ever-present sense of anxiety, frequent acute panic attacks, and bouts of dark depression so severe that she has experienced episodes days or even weeks long where she cannot

leave her bedroom. These are accompanied by total loss of trust, pervasive fear, and a deep, indelible grief.

21.     Morgan has suffered tangible, medically cognizable physical ailments and medical conditions, gruesome and heartbreaking in nature, that, to a reasonable degree of medical and scientific certainty, were proximately, directly, and foreseeably caused and/or exacerbated by the University's, Defendant Ryan's, and Defendant Groves' breaches of trust and violations of Morgan's rights.

22.     Morgan's character and reputation have been utterly destroyed by the University's, Defendant Ryan's, and Defendant Groves' misconduct. She has been terminated from her employment and lost jobs that had been offered to her as a result of these events. Her prospects for employment with the types of companies and entities who employ her former peers have been substantially reduced, if not eliminated entirely. Morgan's chances to attend graduate school, such as law school, have been substantially reduced, if not eliminated entirely.

23.     Among the many ironies born from this travesty, two are particularly poignant: First is the irony that it was Morgan's words which referred to protecting the protesters in a good-natured manner to a random person that would be perverted and persecuted as "true threats" when the teenager's racial harassment and threats against Morgan (both of which were confirmed to have occurred by the University) were deemed by the very same people to be of no moment whatsoever. While the teenager's words and acts and conduct were the very definition of racism and threats, Morgan's words were the very opposite of threatening.

24.     Second is the irony that among all the clamor and hatred of "White Privilege" proclaimed by the teenager and the University community, it is Morgan who comes from truly humble

beginnings, whose father, a local cop, died when she was a freshman in high school, whose mother, a local nurse, was seriously injured several months later, requiring Morgan to serve as her care-giver. Morgan is not feted by University faculty members or local people of prominence. Morgan lives in a rural part of the County. Morgan went to a public community college so she could matriculate to the University. Morgan worked multiple jobs, sometimes on a full-time basis, while she was a student. Morgan embodies the type of person – the person who never got a break, who never had anything handed to her, who had to work, and fall, and rise, and work some more just to even get the chance to become a student at the University of Virginia – who President Ryan so virtuously extols in his convocation and commencement speeches. Morgan is the opposite of privileged.

25. The University of Virginia is the Commonwealth's flagship institution of higher learning. It is a public school and aspires to be one of our nation's "nurseries of democracy." Parents from around the world and the citizens of the Commonwealth entrust the University to educate, nurture, develop, and protect its young people. Those duties to protect include, most especially, the safeguarding of students' physical safety and their sacred civil rights.

26. The University's most senior, high-profile, and high-ranking leaders at the time, specifically including Defendant President James E. Ryan and Defendant Allen W. Groves, then-Dean of Students, owed Morgan Bettinger a duty of utmost care to protect her from race-based harassment, cyber-stalking, and even death threats emanating from the University community. The administrators also owed Morgan Bettinger the duty to protect her civil rights of free speech and the right to be free of race-based discrimination, harassment, and disparate treatment by the University.

27.    Despite their awareness of those duties; despite their extensive knowledge and exquisite familiarity with Morgan Bettinger's clearly established rights and the constitutional and education laws governing the University's acts and omissions under the specific circumstances before them; despite knowing that Morgan was being persecuted purely for protected speech and nothing else at all; despite knowing that Morgan's words, the very speech at issue in this case, occurred in a matter of seconds, two miles away from the University; despite knowing that the speech at issue took place on the outskirts of a protest that had no official association or relation to the University, did not involve University students, faculty, or administrators in any official or even identifiable manner, and was taking place at a time when University operations and facilities were entirely shut down due to COVID-19; despite knowing that Morgan was not enrolled in or taking any online University courses or participating in any University activities (to the extent any such activities existed at all during the summer "lockdowns"); despite possessing compelling evidence of Morgan's actual innocence; despite knowing and being conscious and fully aware of the total absence of credible evidence that could support the accusations against Morgan; and finally, despite their personal knowledge that multiple University investigators had concluded that Morgan was innocent of the charges against her; these Defendants and the Defendant University persecuted, prosecuted, and punished Morgan Bettinger causing her excruciating, irreparable harm and profound damages.

28.    Morgan Bettinger was tormented, publicly shamed, humiliated, ostracized, and punished without a legal or factual basis, all because of her race. Even when faced with the concrete truth of Morgan's innocence, the evidence of the injustices that had befallen her, and the reality that the University's treatment and punishment of Morgan had been based on lies

and gross errors of legal judgment, on behalf of the University and himself, President James E. Ryan personally and intentionally took no actions of any kind to protect Morgan, aided the campaign against her, and then intentionally deprived Morgan of her clearly established constitutional rights of free speech and equal protection on August 10, 2021, all because of the color of her skin.

## II. JURISDICTION AND VENUE

29.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

30.     Subject matter jurisdiction is proper under 28 U.S.C. § 1331 in the United States District Court for the Western District of Virginia because this matter arises under the Constitution and laws of the United States, specifically, the First Amendment of the United States Constitution, the Fourteenth Amendment of the United States Constitution, 42 U.S.C. §§ 1981, 1983, 1985, and 1988, and Title VI of the Civil Rights Act of 1964, found at 42 U.S.C. § 2000d *et seq*.

31.     Venue is proper in the United States District Court for the Western District of Virginia under 28 U.S.C. § 1391 because all of the events, acts, errors, and omissions giving rise to the Plaintiff's claims occurred within this judicial district.

32.     The United States District Court for the Western District of Virginia possesses and may exercise personal jurisdiction over all Defendants under applicable law.

## III. PARTIES

33.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

A.      **THE PLAINTIFF.**

34.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

35.     Morgan Alyse Bettinger is a citizen and resident of Albemarle County, Virginia. She was born in Warrenton, Virginia, in 1999 and moved at an early age to Albemarle County, just outside the City of Charlottesville. Morgan is the only child of her mother, Cary, and her late father, Wayne. Cary Bettinger is a registered nurse who has spent the last fifteen years working at the University of Virginia's Charlottesville hospital. Morgan's father, Wayne, was raised in Scottsville, Virginia and served in law enforcement as a police officer in Charlottesville for the better part of two decades. Morgan adored her dad and admired his passion for law enforcement. Growing up, she wanted nothing more than to attend college at her dream school, the University of Virginia, and perhaps one day become a lawyer in Charlottesville.

36.     Sadly, Wayne Bettinger died when Morgan was just fifteen years old, having just completed her freshman year at Albemarle High School, which is a public school. He was fifty-one years old. Morgan's father died on August 12 and that date would be forever coupled with her father's death, emblazoned in her mind. Just five months later, Morgan's mother suffered serious, life-altering injuries in an accident that broke both legs, among other serious medical conditions, leaving her immobile and unable to care for herself. As a result, for the remainder of her sophomore year, Morgan acted as her mother's primary caregiver. Her ability to participate in normal high school activities and enjoy a typical teenager's social life was severely limited.

37.   When the time came for Morgan to attend college, the absence of financial aid and her family's limited resources required her to modify her plans and attend Piedmont Virginia Community College. Nevertheless, Morgan was resolute in her determination to one day become a "Wahoo," as University of Virginia students are known, so she set about making good grades and working her way through community college with the intent to transfer schools after two years. To do so, Morgan lived at home while working full-time and attending school and studying on a full-time basis. Morgan's academic performance at Piedmont Virginia Community College was exceptional, and she was accepted to continue her studies at the University of Virginia as a member of the Class of 2021.

38.   Upon arrival in the Fall of 2019, Morgan was invited to join the competitive and prestigious Political Philosophy, Policy, and Law major within the College of Arts and Sciences. Morgan was thrilled. Circumstances dictated that Morgan continue to work while pursuing her studies, along with being burdened with student loans. Morgan also continued to assist and support her mother, living at home to do so and help with expenses as well. Morgan persevered and thrived, and, for a time, was happy. She loved her classes and loved her school. Then came 2020.

**B.   DEFENDANT THE UNIVERSITY OF VIRGINIA.**

39.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

40.   "The Rector and Visitors of the University of Virginia" is the official, corporate, and statutory name for the entity known and referred to herein as The University of Virginia (or, alternatively and interchangeably, Defendant The University of Virginia). The University of Virginia is governed by a Board of Visitors, whose duties and powers are

determined and controlled by the statutes of the Commonwealth of Virginia, as amended from time-to-time by the General Assembly. The portions of the Code of Virginia that provide for the general organization and governance of the University of Virginia may be found in Va. Code Sections 23.1-2200, *et seq*. The Manual of the Board of Visitors of the University of Virginia constitutes the corporate bylaws of the University of Virginia, and sets forth the Board of Visitors' internal organization, procedures of operation, and the responsibilities of the administrative officers selected by it to carry out its directives of policy and program. According to the Manual, the University of Virginia is a:

> public institution of higher learning guided by a founding vision of discovery, innovation, and development of the full potential of talented students from all walks of life. It serves the Commonwealth of Virginia, the nation, and the world by developing responsible citizen leaders and professionals; advancing, preserving, and disseminating knowledge; and providing world-class patient care.

41.  As to Defendant The University of Virginia, the Plaintiff seeks a declaratory judgment, injunctive relief, and attorneys' fees and costs under 42 U.S.C. §§ 1981, 1983 and 1988 and Title VI, found at 42 U.S.C. § 2000d *et seq.*, and the full extent of compensatory damages permitted under applicable law by Title VI. At all times and in all events relevant and material to this action, Defendant The University of Virginia acted under color of state law and authority.

**C.**     **DEFENDANT THE BOARD OF VISITORS.**

42.  The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

43.  Defendant The Board of Visitors is a separate and distinct legally cognizable entity, capable of suing and being sued, and a proper party to effect prospective injunctive relief for the Plaintiff. The Defendant Board of Visitors is being sued in its official capacity.

Defendant The Board of Visitors has its own website, its own separate and distinct offices, and its own employees/staff, including a Clerk of the Board of Visitors and a Secretary to the Board of Visitors.

44. According to the 2022 Board Basics Book and the Statement of Visitor Responsibility included therein, Defendant The Board of Visitors is the governing body of the Defendant University: "Broadly, the Board has oversight responsibility for advancing the University's mission and goals, for assuring the proper stewardship of the University's resources and assets, and for monitoring the implementation of institutional strategy and policies. Among the Board's primary and most important duties are appointing and evaluating the University's president." 2022 Board Basics Book, Office of the Board of Visitors, p. 6.

45. Defendant The Board of Visitors' website states:

> The Board of Visitors is composed of seventeen voting members appointed by the Governor of the Commonwealth of Virginia, subject to confirmation by the General Assembly, for terms of four years. In addition, the Board of Visitors appoints, for a one-year term, a full-time student and faculty member at the University of Virginia as non-voting members of the Board of Visitors. The Rector and Visitors serve as the corporate board for the University of Virginia, and are responsible for the long-term planning of the University. The Board approves the policies and budget for the University, and is entrusted with the preservation of the University's many traditions, including the Honor System. The Board maintains offices in the Northwest Wing of the Rotunda and meets four times per year. The meetings are open to the public, but there will be no opportunity for public comment.

46. At all times relevant to this action, the Defendant Board of Visitors acted under color of state law and authority.

**D.    INDIVIDUAL VISITOR or TRUSTEE DEFENDANTS.**

47. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

14

48.     Defendants Rector Robert D. Hardie, Vice-Rector Carlos M. Brown, Robert M. Blue, Mark
        T. Bowles, Elizabeth M. Cranwell, Thomas A. DePasquale, U. Bertram Ellis, Jr., Paul C.
        Harris, Babur B. Lateef, M.D., Stephen P. Long, M.D., Paul Manning, James B. Murray,
        John L. Nau, The Honorable L.F. Payne, Amanda L. Pillion, Rachel W. Sheridan, and
        Douglas D. Wetmore are members of the current Board of Visitors who are, pursuant to
        Section 2.4(10) of The Manual of the Board of Visitors of the University of Virginia, tasked
        with, among other responsibilities, the regulation of the government and discipline of
        students.

49.     The Plaintiff does not seek any form of financial award or payment from any individual
        trustee or Visitor in his or her individual or personal capacity. Instead, the individual
        Visitors are being named primarily in their official capacities, but also in their individual
        and personal capacities, in an abundance of caution, for the sole purpose of securing and
        implementing prospective injunctive relief to the maximum extent permitted by applicable
        law. At all times relevant to the Complaint, the Individual Defendant Visitors acted and
        will be acting under color of state law and authority.

**E.      DEFENDANT PRESIDENT JAMES E. RYAN.**

50.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above
        as if alleged anew.

51.     Defendant James E. Ryan, who is being sued in his official, individual, and personal
        capacities, is the ninth President of the University of Virginia and was serving in that
        position at all times relevant to this action. Pursuant to Sections 4.22(7) and (9) of The
        Manual of the Board of Visitors of the University of Virginia:

As the principal administrative officer of the University and chief executive officer of the Academic Division, the President shall have the following powers and duties:

\*\*\*

(7) The President shall at all times maintain cordial relationships with the students, guarding and protecting their best interests;

\*\*\*

(9) The President shall be responsible for the discipline of students with the power to impose appropriate penalties including expulsion;

\*\*\*

52.    Originally from New Jersey, President Ryan now lives at Carr's Hill, the University President's mansion across from the Rotunda on the University Grounds in Charlottesville. The value of President Ryan's annual compensation and benefits purportedly exceed $1,000,000, perhaps far more. President Ryan received his undergraduate degree from Yale University, garnering *summa cum laude* and Phi Beta Kappa honors, and received his juris doctorate from the University of Virginia's School of Law, where he attended on a "full scholarship" and graduated number one in his class in 1992. After law school, President Ryan served twice as a federal judicial law clerk, first in the United States Court of Appeals for the Ninth Circuit and then for the Chief Justice of the United States Supreme Court. President Ryan practiced law briefly in the field of constitutional law before returning to academia, where he spent fifteen years as a law professor, mostly at the University of Virginia, but with stints as a visiting professor at Harvard Law School and Yale Law School. In 2013, President Ryan became the Dean of Harvard's Graduate School of Education, where he presided before becoming the University of Virginia's president in 2018. President Ryan's primary fields of teaching were constitutional law and education law, and, while in academia, President Ryan even argued a constitutional matter before the

United States Supreme Court for a law school clinic. President Ryan has written numerous books, articles, and publications and has taught numerous classes and seminars on the subject of constitutional law and education law and the "intersection" of the two fields of study.

53.    Defendant President Ryan is the University of Virginia's supreme and ultimate arbiter and administrator over student discipline, its imposition and its resolution or withdrawal, and over the protection of every student's "best interests," including their physical safety and most fundamental civil rights. Defendant President Ryan does not have the legal authority to shirk, abrogate, or delegate his ultimate responsibilities over student discipline, and he is not legally permitted to delegate away his duties to protect his students' "best interests" and their constitutionally protected civil rights, even under the guise of "student self-government."

54.    In fact and importantly, the University of Virginia's own <u>Statement of Students' Rights and Responsibilities</u> includes a subsection dedicated to "Cases Decided by the President." That subsection provides:

> The University President may initiate, intervene in, and preempt proceedings before any University body when the President determines, in his or her sole discretion, that established processes will be unable to timely or properly adjudicate a case or complaint including, but not limited to, cases involving students arrested, charged, or convicted of criminal conduct or other serious conduct not involving criminal proceedings which reasonably endangers or threatens to disrupt the University community or University operations.

> Disciplinary proceedings before the President shall not be governed by established procedures of other University bodies and shall terminate proceedings involving the same alleged misconduct before any other University body unless otherwise authorized by the President.

> The jurisdiction of University bodies shall be subject to the continuing authority of the President to discipline, suspend, and/or expel as provided above.

55. By operation of law, the factual effect of his personal acts, errors, and omissions, and his own admissions, President Ryan was and remains to this day the sole person with the authority to render and approve the decisions, efforts, strategy, resolution, and disposition of Morgan Bettinger's student experience and her mistreatment by the University and the University's mishandling of this matter, including the instant litigation. At all times relevant to this Complaint, President Ryan acted under color of state law and authority, and he is sued in his personal, individual, and official capacities.

**F.    DEFENDANT ALLEN W. GROVES.**

56. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

57. Defendant Allen W. Groves currently lives and works in the State of New York, where he is employed as the Senior Vice President and Chief Student Experience Officer for Syracuse University in Syracuse.

58. Like President Ryan, Mr. Groves attended the University of Virginia's School of Law, graduating in 1990, during the same time-period President Ryan was a student there. After law school, Mr. Groves practiced law at the Atlanta, Georgia office of an international law firm that claims to employ approximately 900 lawyers across seventeen offices, providing advisory, litigation, and transactional legal services to clients worldwide. Mr. Groves was a litigator in the field of employment law, which meant that he became professionally versed and knowledgeable about the civil rights laws and theories that form the bedrock of employment discrimination and retaliation claims. Mr. Groves rose to the level of equity

partner before leaving the practice of law and returning to Charlottesville, Virginia where he accepted a position with the University's Department of Student Affairs in 2006. At the University, Mr. Groves exhibited a familiarity with education law and constitutional law that brought high public praise from universally beloved former Chief Student Affairs Officer Patricia M. Lampkin, who was reported to have commented that Mr. Groves' legal background and knowledge of First Amendment issues and their application to higher education was a "key to his success."

59.     In 2008, Mr. Groves was promoted to the position of Associate Vice President and Dean of Students, a role he occupied until 2021. In evidence related to this case, Mr. Groves advised Morgan that in his opinion, the decision to persecute or punish her, including the decision to declare her conduct or speech a "threat" and then decision to ignore threats against Morgan and refuse to take any actions to protect her, "ultimately rest[ed]" with him.

60.     At all times relevant to this Complaint, Mr. Groves acted under color of state law and authority, and he is sued in his personal, individual, and official capacities.

### IV. THE FACTS

61.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

**A.      EVENING AT HIGH STREET – FRIDAY, JULY 17, 2020.**

62.     The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

63. Sometime shortly after 7:45PM, on Friday, July 17, 2020, about forty-five minutes before sunset, Morgan Bettinger, a diminutive, twenty-one-year-old woman, left for home after a twelve-hour workday.

64. Morgan lives in the County, just outside City limits.

65. Morgan drove a Subaru station wagon and took the exact route, without deviation, that she took every single time prior when she left this particular workplace to go home.

66. Morgan's route took her onto High Street, which is a busy two-way road lined with law firms, City and County buildings, and other businesses. On most days, High Street is heavily trafficked.

67. On that evening, as the sun was setting, Morgan turned left onto High Street in the Downtown area to go home, thinking about the upcoming weekend, and maybe, finally, having a little time off from the two jobs she was working to support her family and herself.

68. As Morgan drove towards the block between Third Street NE and Fourth Street NE on High Street, well below the speed limit – a route she had driven hundreds of times previously without incident – she could see vehicles in front of her but did not know that her route was completely blocked.

69. Between the two side streets, but still on High Street, the "main thoroughfare," as Morgan came to a stop where traffic was at a complete standstill, she realized that she could proceed no further. She eased her car to the left side of the road and activated her hazard lights.

70. At that moment, Morgan did not know:

A)    that traffic on High Street and on adjacent streets that could serve as a detour or means of egress was totally blocked for vehicular traffic;

B) that traffic was being blocked by "racial justice protesters" affiliated with a group or groups known as "BLM" or "Black Lives Matter;"

C) that some of the protesters were also associated with, claimed membership in local chapters of, or had participated in rallies and protests involving "ANTIFA," an anti-social, violent, anarchist extremist group;

D) that the protesters were staging a "noise demonstration," or "NOISE DEMO," in their parlance, involving the loud and physical disruption of traffic, businesses, and diners in downtown Charlottesville;

E) that the protest was unpermitted and "illegal," according to police reports;

F) that Charlottesville Police officers were purposefully absent or would be invisible "on scene" and not discernibly present;

G) that the protesters failed or refused to use and in fact did not use any barricades, barriers, or chicanes of any kind whatsoever to manage pedestrian or vehicular traffic;

H) that the "NOISE DEMO," involved megaphones, vulgar and aggressive chants, vulgar and offensive signs, and banners being affixed to public and private property;

I) that protesters were physically gathered and gathering on High Street, in traffic, on a normally busy street, in front of the Charlottesville-Albemarle County Juvenile and Domestic Relations Courthouse, standing, sitting, and in some cases kneeling in the road;

J) that the protesters and their organizers failed or refused to make any effort to alert innocent, uninvolved bystanders, pedestrians, or drivers of their protest, their

intentions, or the means by which uninvolved people could safely avoid the protest and leave the area;

K)     that protesters and their organizers failed or refused to take any precautions to ensure the safety of any participant or non-participant or any of the public or private property in the vicinity;

L)     that the protesters and their organizers had invited or alerted University community members, including prominent faculty who consider themselves to be "racial justice activists," to attend and participate in the demonstration;

M)     that those University teachers/faculty members failed or refused to alert University Police, the University community at large, or University students who might have remained in Charlottesville during the "lockdowns" about the race-based protest and failed or refused to take measures to ensure the safety of their students (whether the students were participants in the protest or not);

N)     that the protesters and organizers had undertaken no efforts whatsoever to ensure the presence of a single first responder, EMT, crowd management professional, or traffic (vehicular or pedestrian) manager (and, in fact, no such individual was present);

O)     that among the protesters or "activists" present on High Street were men (and some women) with extensive criminal histories that included violent crime charges, some of whom were associated with anarchist, anti-social groups who seek to overthrow our nation's civic and societal institutions;

P)     that the protest organizers and participants failed or refused to provide any form of traffic or crowd control, and none of the protesters made any effort to direct

oncoming cars or uninvolved pedestrians away from the area of protest, despite ample opportunities to do so; and

Q)      that certain organizers and protesters were equipped with ordinary instruments and materiel that rioters and protesters across the country had learned to convert and use in violent protests such as bicycles, long, large, rolled umbrellas, helmets, bicycle locks, as well as other implements such as handheld radio devices (walkie-talkies) and cell phones utilizing social media and "apps" such as WhatsApp and Discord, among others.

71.    Though the protest, its origins, its participants, and its organizers were totally unknown to Morgan as she slowly pulled her car to a stop on that July evening, the following facts are true and cannot be (and have never been) credibly disputed:

A)      the University of Virginia premises and operations were shuttered and "locked down." School was not in session, and Morgan was not enrolled in classes or activities. The University has never claimed that school was in session or that Morgan was engaged in any University program, class, or activity on that day;

B)      the protest occurred "off campus" as that term and phrase are understood and defined by applicable law and federal precedent applicable to the First Amendment and to the University. In fact, the entire physical footprint of the protest took place two miles away from University property, off of and away from University premises, campus, "the Grounds," facilities, or property. The University of Virginia has never claimed that the protest took place on any University property or facilities;

C)      the University of Virginia did not sanction, sponsor, organize, or manage the protest and has never claimed to have sanctioned, sponsored, organized, or managed the protest;

D)      despite being organized by a University of Virginia student and despite the fact that many of the teenager's followers and fellow activists are University students, faculty, and staff, the University of Virginia failed or refused to take any measures of any kind to protect or warn its students or members of the University of Virginia community that the protest was occurring;

E)      the University failed or refused to warn or admonish students or community members or anyone under its jurisdiction regarding the behavior the University expected of them should they attend or find themselves present or caught in the midst of the protest;

F)      the University of Virginia failed or refused to undertake even the most minimal of measures to protect its students from harm or threats of harm associated with the protest; and

G)      the University of Virginia failed or refused to place the University's vast medical, law enforcement or student support services on "ready alert." The University failed to utilize its enormous, high-technology instruments of mass communication – community-wide emails, community-wide text messages, social media – to alert members of its community that a BLM protest would be underway.

72.     Morgan – tired and ready for a nice night and weekend at home with her mother after a long, hard twelve-hour shift of work – knew none of this when she parked her car, put on

her surgical mask, activated her hazard lights and started walking towards a City of Charlottesville dump truck blocking High Street to explore just how she could get home.

73.    Morgan could see that several private/civilian vehicles were positioned on High Street and on Fourth Street NE, not only blocking High Street but any route of detour as well.

74.    Morgan could not see any police officers or law enforcement presence of any kind, anywhere.

75.    Morgan could not see any barricades, barriers, or chicanes managing vehicular or foot traffic, because none were present.

76.    Due to her diminutive height and the size of the truck and the setting of the sun, Morgan's view of the protest beyond the hood of the dump truck was extremely limited. What Morgan could mostly see was a large group of protesters sitting and kneeling in the middle of High Street, more than a few of whom were dressed all in black or dark clothing.

77.    Morgan was several car lengths or more from her car. The truck's driver-side window was open, the engine was running, and a White male of indeterminate age, identified in police reports as Landon Shifflett, was in the driver's seat.

78.    Mr. Shifflett spoke to Morgan, asking her in a friendly and courteous manner if she was "okay," presumably because her hazard lights were illuminated. She responded that she was "fine" and then commented that she hoped he was being paid well to work on a Friday night.

79.    Morgan then spoke <u>fifteen words</u> to Mr. Shifflett and only Mr. Shifflett:

    A)    "Well, it's a good thing you're here because otherwise they could be made speed bumps."

    B)    Fifteen words.

C)      These are the fifteen words that the University of Virginia's Office of Equal Opportunity and Civil Rights' professional investigators concluded that Morgan spoke to Mr. Shifflett after a nearly year-long investigation.

D)      Morgan does not recall whether she laughed when she spoke the words, but she does recall saying the words in a manner intended to be humorous, casual, and friendly.

E)      Morgan was standing a fair distance from her car, dressed in running tights, flip flops, and a tank top, unarmed in all ways, with just a phone and her keys in her hands, when she spoke to Mr. Shifflett.

F)      Morgan's tone was courteous, cordial, and friendly and she smiled with a pleasant countenance on her face.

G)      Morgan did not point her fingers or hands at anyone nor look away from Mr. Shifflett, nor did she imply or intimate through tone or body language any form of threat or menacing intent.

H)      Mr. Shifflett did not respond with surprise or fear or concern. In fact, Morgan's comment was so innocuous that when asked about it later, Mr. Shifflett *didn't even recall Morgan saying it.*

I)      Morgan spoke only to Mr. Shifflett and did not repeat the phrase ever again.

J)      Simply put, Morgan Bettinger did not intend to utter a threat, did not threaten anyone, and no one who has honestly reviewed the fifteen words she spoke has ever concluded otherwise.

K)  Morgan did not know and did not see that the teenaged "racial justice activist" protest organizer[4] who would, just moments later, launch a false and malicious campaign against her, was present in the downtown area. The teenaged activist would later admit that she never heard Morgan speak and would later admit to University officials that her accusations against Morgan may have been based "on something she 'misheard.'"

L)  Morgan did not personally know the teenaged activist, did not know she organized or was involved in the protest, and did not know she was in the vicinity. Morgan wasn't speaking to anyone but the truck driver and the teenaged activist wasn't nearby or anywhere near Morgan or her car or even within her sight when she spoke.

80.  Morgan's conversation with Mr. Shifflett only occupied a few moments.

81.  Morgan walked around the large dump truck to observe the protest to get a sense of how long traffic might be delayed.

82.  Morgan suddenly became aware that a large, bearded man wearing a reflective vest and a group of protesters seemed to be directing their attention to her.

83.  Morgan became apprehensive, called her mother on her phone and quickly started walking towards her car, sensing danger.

---

[4]      Although the teenaged activist has readily identified herself in the press and public domain regarding this particular matter, the Plaintiff and her counsel are refraining from using her name in this pleading because (1) the activist was a teenager and a student when the July 17, 2020 incident occurred; (2) the University and Defendants have been known to use aggressive litigation tactics against opponents under the guise of "confidentiality" and "secrecy" of matters involving students and student records; and (3) the Plaintiff and her counsel fear retaliation, being "doxxed," or prejudiced by the Defendants and the University community as a result of this litigation. If the Court instructs the Plaintiff to identify the activist by name, she is prepared to immediately provide that information publicly or under seal. The Plaintiff and her counsel intend to move the Court for appropriate relief enjoining any retaliation or retaliatory measures by the Defendants while litigation is pending.

84.     The bearded man then approached her in a somewhat menacing manner, with his phone thrust outwards, as if recording or photographing her. Morgan generally sensed or recalled seeing the man circle her car before approaching her. Morgan's Subaru's back bumper is adorned with two pro-police stickers, in reverence and honor of her father. The man is believed to have utilized either a handheld radio device or applications such as Discord or WhatsApp on his smart phone to alert other protesters of Morgan's presence.

85.     The man in the reflective vest has since been identified as possessing a criminal history that includes felony charges and has an extensive history attending rallies or protests where certain anti-social, allegedly violent, extremist organizations were present.

86.     Another man appeared alongside the bearded man in the reflective vest. This man was taller but slightly thinner than the man in the reflective vest and was wearing a backpack and carrying a rolled-up long, large umbrella. A third man joined the group, also wearing a backpack, riding a bicycle (which is another instrument used by "ANTIFA-type" protesters).

87.     Once Morgan was inside her vehicle, she saw a larger group of people converging towards her, but, again, Morgan did not see the woman who would later be identified as the teenaged activist organizer among them and, again, no police were present or visible, anywhere.

88.     Morgan's mother advised her to get home safely – the call was ended.

89.     Suddenly, two women, but not the teenaged organizer activist, appeared, came within a few inches of Morgan's driver's side window and became very aggressive in their words, comments, tone, and physical demeanor.

90.    Within moments multiple protesters joined them, shouting vulgarities and racial epithets at Morgan.

91.    One or more of the protesters started slamming their hands on the car, including the driver's side window. The impact on the window was so forceful that Morgan feared the glass would break at any moment.

92.    Morgan called the police.

93.    The protesters surrounding Morgan's vehicle loudly and aggressively jeered, taunted, and mocked Morgan.

94.    At some point, the crowd around Morgan's vehicle included the teenager activist.

95.    In videos that appear to have been edited or altered but were widely circulated in a digital format by the protesters, the woman who has since been identified as the teenaged "activist" can be heard yelling racial epithets and screaming questions such as "what did she say?"

96.    Though edited and altered, these video segments include no threats by Morgan Bettinger and clearly show that the teenager never spoke with Morgan Bettinger *and did not even know what Morgan had previously said*. The teenager has admitted on several occasions and in several separate interviews that she never heard Morgan Bettinger speak, she never heard Morgan Bettinger threaten her, and she never heard Morgan utter or speak the phrase including the words "speed bumps."

97.    Morgan heard protesters yelling racial slurs and epithets at her.

98.    "Karen!"

99.    "It's a Karen!"

100.   "Fucking cry, Bitch!"

29

101. "Some of us from the 'hood, we gonna whoop her ass or we gonna whoop her ass, which one?"

102. The epithet "Karen" is a racial slur directed at or about White women. It is used exclusively as a racial slur with no secondary meaning. The epithet has no application to people other than White women.

103. Morgan's race is "White."

104. The teenaged activist's race is "Black."

105. The foregoing are just some of the many offensive and aggressive slurs and epithets being hurled at Morgan.

106. Morgan was placed in fear of imminent serious bodily harm; she was afraid for her physical safety.

107. From the time Morgan turned left onto High Street until the moments after she retreated to her car, surrounded by protesters, she never saw, spoke to, or addressed the teenaged activist dressed in black clothing, who was now yelling profanities and racial slurs at her, and standing in front of her car.

108. At that moment, Morgan <u>did not</u> know:

A)      that the teenager was the leader and one of the organizers of the protest;

B)      that the teenager claimed to be a "racial justice activist" who first became active in racial protests and activism when she was just twelve years old. Also, the teenager had just completed her freshman or "First" year of college at the University of Virginia;

C)      that the teenager also had claimed at various times to be solely responsible for triggering the events that led to the Unite the Right rallies, counter-protests, property destruction, and loss of life;

D)      that the teenager had been treated like a celebrity by the University's most prominent faculty members, student leaders, and senior leadership. In fact, her likeness had been emblazoned on University buses and posters across Grounds.

E)      that the teenager herself boasted tens of thousands of "followers" on social media and other communication instruments, and that her "followers" included prominent University officials, faculty, and students; and

F)      that the teenaged, racial justice Karen-hunter had found her Karen.

109.   The Charlottesville Police Department's report would include an eyewitness's observation that protesters were "rushing" Morgan's car.

110.   The University's own investigation would conclude that the term "Karen" is a racial epithet and that the teenager herself called Morgan a "Karen" no less than seven times as she circled Morgan's car.

111.   The venom and vehemence of the protester's screams, their physical proximity to her, and the pounding on her car had the effect of placing Morgan in fear of imminent physical danger.

112.   Morgan called police when one of the protesters starting slamming her hand onto the car with enough force to break a window.

113.   A Charlottesville police officer who was monitoring the protests from an unmarked van received notice of a woman in distress and responded to the call.

114.   While the activists first "rushed," then surrounded, then beat and pounded on her car, the protesters, including the teenaged "activist" leader, blocked Morgan's vehicle from moving in an effort to further intimidate and harass her and prevent her from fleeing for safety.

115.   The teenager circled around Morgan's car several times, stood in front of Morgan's car, taunted and mocked Morgan, shouted profanities at Morgan, and yelled comments in the form of questions in a sarcastic tone. In fact, the teenager can be heard "whooping" and mockingly saying "awwww, she's crying!"

116.   Not once did the teenager act afraid or apprehensive of a threat of any sort against her; not once did the teenager act as if she believed that Morgan had threatened her; not once did the teenager act as if she heard Morgan speak, at all.

117.   Once a police officer appeared and made his presence known, the protesters dispersed and Morgan was given room to follow the police officer's directions, driving away at a very slow, idling speed, to a nearby street.

118.   A few streets away, with the Charlottesville police officer nearby, Morgan broke down, crying and shaking, alone in her car.

119.   Morgan proceeded home, thoroughly disturbed, shaken, and distraught. Morgan hoped that the nightmare she had witnessed and experienced was over.

120.   Unfortunately, the teenager and her mob were just getting started.

**B.   THE MALICIOUS, FALSE, RACIALLY MOTIVATED CAMPAIGN IS LAUNCHED.**

121.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

122.   Within moments of Morgan's arrival at the protest, the protesters began communicating amongst themselves and to the general public about Morgan.

123.   The teenager took to her massive platform on social media and smart phone text applications such as Discord and WhatsApp to falsely and maliciously accuse Morgan of racism and conveying threats:

> **SHARE/SPREAD THIS! TRIGGER WARNING:**
>
> The woman in this truck approached protesters in Charlottesville and told us that we would make good speed bumps mind you, a protester was killed by a man in a car in Charlottesville during the A12 rally in 2017.
>
> #BlackLivesMatter

124.   Share and spread they did.

125.   All of it – every bit of it – was false and defamatory and designed to enflame and enrage the community and destroy Morgan Bettinger – the "Karen."

126.   The teenager's false and defamatory communications quickly went "viral," and followers of the activist's social media platform (her personal Twitter account alone boasts of more than 11,000 followers), many of whom were members of the University community, including prominent faculty, students, and even alumni, were quick to join the frenzy, adding to the cyber-harassment themselves while also augmenting and "amplifying" the harassment and defamatory accusations.

127.   The publications or posts, as they are called, included racial epithets, threats of violence (including graphic and disturbing death threats), cyber-stalking, and "doxxing" – the abhorrent and dangerous practice of publicly broadcasting a person's identity, image, and personal and private information into online public forums.

128.   Soon, Morgan's full name, image, local address, license plate, education history, information about her family, and even photographs of her deceased father (a former

Charlottesville police officer) were plastered by the teenager and her followers across social media, where they were shared, quoted, and re-published countless times.

129.    By way of just one example:

> Good morning everyone but Albemarle High grad, UVA student and daughter of a cop, Morgan Alyse Bettinger, who threatened protestors in Charlottesville last night by saying from her blue Subaru that we'd "make good speed bumps"

130.    This cyber-campaign, including the racial harassment, false accusations, and threats, garnered thousands of public "views," "quotes," "re-posts," and "re-tweets."

131.    The campaign involved hundreds of communications and interactions. Morgan was:

A)      described as a "fucking Nazi;"

B)      defamed as a "racist,"

C)      described as "someone who promotes domestic terrorism;"

D)      called a "coddle[d]" "little white girl;"

E)      called a "racist bitch" who "changed her name on Facebook;"

F)      slurred and taunted with racial epithets.

132.    Within minutes, the teenager's campaign had succeeded in falsely branding Morgan as a "racist" "domestic terrorist" who had "threatened" her and committed what amounted to racially motivated "hate crimes."

133.    The persecution of Morgan took an ominous and chilling turn when the teenager's followers, who had been "called to action," put their intentions to hurt Morgan and to commit violence in writing, for all to see and, perhaps, follow suit.

134.    The teenager's campaign, broadcast across a vast network, audience, and platform, included a multitude of death threats, with explicit promises to hurt Morgan, to torture Morgan, and to kill her in gruesome and inhumane ways:

A)      " . . . If anything she's the one about to be given to God."

B)      "Go get her! . . . I'm gonna motherfucking go get her . . . ." This threat was screamed in person as Morgan was attempting to retreat and escape the "rush" of people intent on doing her harm;

C)      "If I ever see this stupid-ass license plate around town . . . it's on." This clear and obvious threat of violence is especially dangerous because the follower implied that he/she operates in an area where Morgan lives and that he/she would be hunting for Morgan;

D)      "How fucking embarrassing . . . I went to high school w that fucking racist . . . yall blast her, her names Morgan Bettinger . . . [.]" The personal ugliness and raw violence of this threat really needs no further elaboration;

E)      One follower threatened and encouraged others to use adhesives and glue-like substances – including photographs of the substances along with the words "apply liberally to tailpipe" – for the purpose of causing carbon monoxide asphyxiation in Morgan's car;

F)      "Not so fast Morgan. We're on to you . . ." This type of threat is perhaps the most psychologically tormenting of all. One need not be a classics scholar to know that the teenager and her followers had hung a virtual Sword of Damocles over Morgan's head and that any moment, it would fall;

G)      "Torch her fucking car. Up to her if she wants to remain in it while it is being disarmed." The gruesome and graphic nature of this threat and the fact that no one associated with the University of Virginia expressed any concern about it or took any action of any kind are particularly shocking. Neither the teenager nor the

35

University took any steps to disavow or condemn threats such as this in which the writer promised to set Morgan's car on fire and burn her alive inside it. Hyperbolic and theatrical language need not be employed to accurately capture the terror that threats like this evoked and the fear and apprehension Morgan has experienced every time she leaves her house.

135.   As alleged above, the teenager's followers and the ranks of those participating in her protest included members of local chapters or loosely configured affiliates of larger national groups who have been linked to riots, property destruction, and even murder. For instance, "Henrico Antifa Central Command" referred to Morgan as "Driver Karen" in its publications about her.

136.   Through the night, into the following morning, and for many days to follow, the teenager's "call to action" as she termed it (in writing) evolved from widespread, malicious, and patently false defamation, to harassment, bullying, and death threats, to a mass campaign to have Morgan punished by and banished from the University of Virginia.

137.   The teenager's "call to action" demanded that her followers conduct a mass complaint campaign seeking Morgan's physical, educational and social expulsion and ostracization from the University of Virginia and its community, all entirely premised on her false accusation. Among the teenager's many demands and "calls to action:"

> EMAIL these UVA deans now to demand Morgan face consequences for her actions and that UVA stop graduating racists.

> ***

> Please put pressure on the university to stand with Black community members AND STUDENTS who were directly threatened by Morgan Alyse Bettinger's actions.

The widely broadcast demand included the names and addresses of prominent and influential administrators at the University of Virginia.

138.   Not only is the "call to action" based upon, motivated by, and because of race, specifically including Morgan's race (and would not have happened or occurred "but for" Morgan's race), the University does not possess evidence and cannot point to any evidence supporting a conclusion that race was not the singular, driving force and sole purpose behind the teenager's campaign. This was a hate-filled, racist effort by the teenager and Morgan Bettinger was targeted because of her race.

139.   The teenager and her followers directed their false complaints to University officials who appear to have been selected because they were perceived to be biased in favor of the teenager and her cause of "racial justice" and would harbor prejudice against students like Morgan.

140.   In addition to the many published posts threatening and humiliating Morgan, the teenager posted information mocking Morgan's college matriculation choices and process – Morgan was an outsider and the teenager wanted her followers to petition University officials who they believed would not care for or about a poor girl from the County who came to the vaunted University of Virginia from Piedmont Virginia Community College.

141.   So open and obvious was this intent, one follower of the teenager publicly commented that they should select Defendant Allen Groves, who would be "especially interested" and biased, because, they claimed, he was physically injured, deeply wounded, and emotionally scarred by the Unite the Right precursor conflagrations on the evening of August 11, 2017.

142.   As alleged below, Defendant Groves never advised Morgan or her counsel that he was a victim of or scarred by the Unite the Right tragedy and that his emotions, feelings, and

biases regarding that incident could impact his perception and judgment of Morgan or create conflicts of interest regarding this matter.

143.   In response to the teenager's "call to action," the University of Virginia was inundated with more than one hundred complaints against Morgan in various forms, including formal complaints, online submissions, and telephonic complaints. The complaints were substantially similar and materially identical to the teenager's falsehoods and demands for Morgan's expulsion.

144.   Without reviewing a single item of evidence or hearing Morgan's version of events, prominent and influential faculty members and student leaders rushed to condemn Morgan, adjudge her guilty, and demand her expulsion. They broadcast these prejudicial beliefs and positions to a vast audience that no doubt included many or most of the University officials and students who would be called upon by Defendants Groves and Ryan to pass judgment upon Morgan in the very near future.

145.   One such faculty member, who occupies a prestigious position and enjoys a large following and audience (the faculty member's personal Twitter account alone has more than 6,000 followers) condemned Morgan *within minutes of the incident*, suggesting that Morgan should be arrested.

146.   The University of Virginia's Student Council and the University Judiciary Committee are organizations that enjoy high prestige and influence throughout the University community. Under the University's operating policies and procedures, the Student Council and "UJC" are each considered to be an "agency" of the University that "performs duties typically managed by professional staff at other schools." The agencies are "University sponsored and supported" and enjoy "full liability coverage and staff support." Therefore, agents and

officials of these University organizations are University actors – agents and officials of the University – and when they act, err, or omit, they do so under color of state law and University authority.

147. On the very weekend the incident occurred, before two full days had elapsed, the President of the University of Virginia Student Council, who is a University actor and agent acting under color of state law and University authority, published a statement condemning Morgan without reviewing a single item of evidence, without meeting Morgan, without hearing her version of events, and without reviewing the laws and authorities that would govern this controversy:

> Absolutely disgusting. She knew the history, and she knew what she was doing. A person who makes this kind of threat should not be a student at UVA. There can be no community of trust with people like her in it.

148. Members of other high prestige organizations, including the UJC, would have received the Student Council President's condemnation and call for expulsion.

149. Interestingly, as discussed below and shown throughout the evidence adduced thus far in the case, the University and Defendants Groves and Ryan would adopt the University Student Council President's false, illegal, and totally incorrect reasoning and logic that what Morgan was supposed to "know" about "the history" could somehow be relevant to or dispositive of her guilt.

150. The teenager activist behind the false complaints and campaign was also a member of Student Council and therefore in frequent communication and interaction with other students in these "agency level" organizations as well as senior administrators in the Student Affairs Division and Office of the President.

151.  The Dean of Students and the President of the University, as well as their respective official University offices and departments, were immediately on actual notice of the incident, the controversy, and the maelstrom of abuse directed at Morgan.

152.  The Office of the University President manages and closely monitors all events, incidents, and controversies such as this one and those involving the University, its Grounds, or its community on a 24/7 basis.

153.  Despite the racist abuse and racial harassment, despite the written threats and promises of death and grievous bodily harm, despite the "doxxing" and cyber-bullying, despite the concerted actions to interfere with and deny Morgan her rights as a University student, despite all of these actions and misconduct which individually and collectively violate not only numerous state and federal laws but the University's own anti-discrimination and anti-harassment and student codes of conduct, neither the University administration nor Defendant Groves nor Defendant Ryan, to this day, have ever taken any action to protect Morgan, protect the community, or prosecute the offenders.

154.  The Office of the University President also manages, maintains, and monitors social media and uses those platforms to communicate with the community. The official "@UVA" account on Twitter has more than 100,000 followers. The "@PresJimRyan" account on Twitter claims more than 24,400 followers. Those are just two of the many social media and communications applications utilized by the University and its thousands of faculty and administrators to conduct University business, communicate with the University community, and broadcast University "messaging."

155.  As directed by the teenager and the "Call to Action," one follower sent this demand to Defendant Ryan on his @PresJimRyan account:

> if you allow this student to prosper at uva you are heralding her to cause further harm to Black folks throughout her career.  if you want @uva to be an institution that is safe for Black students and COMMUNITY MEMBERS, you need to expel students that threaten them[.]

156.   Without speaking to Morgan, without conducting a single formal interview of an eyewitness, without speaking to or reviewing the reports of law enforcement officers who were present at the scene, and in actual possession of evidence that appears to undermine the veracity and accuracy of the complainants' versions of events, at 2:12 PM on Sunday, July 19, less than forty-eight hours after the encounter on High Street, the University administration published a social media post to its more than 100,000 followers on its "@UVA" Twitter account:

> The University strongly condemns any threat directed at other members of our community. We are aware of the allegations on social media about a student's conduct with respect to a protest in the city and are actively investigating the matter.

157.   Like the posts from the Student Council President rushing to judge Morgan Bettinger, the University's "condemnations" were received by numerous members of the University's investigatory bodies and "agency level" student organizations, such as Student Council, and, importantly, the University Judiciary Committee.

158.   The University's publications and proclamations did nothing but further enrage and enflame the racial justice community and the teenager's followers. They also had the very real effect of thoroughly prejudicing and poisoning the entire University community against Morgan, including people who would later be chosen by the Defendants and their administration to serve as University investigators and the University Judiciary Committee's "jurors."

159.    The teenager and the mob of followers wanted Morgan's head. They screamed for Morgan

to be humiliated, shamed, and banished.

160.    They insisted that the University of Virginia wield the executioner's axe.

161.    Defendants Ryan, Groves, and the University of Virginia were more than happy to oblige.

**C.      THE UNIVERSITY OF VIRGINIA – INSTRUMENTS OF DISCIPLINE.**

162.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above

as if alleged anew.

163.    The University of Virginia possessed a veritable arsenal of instruments that it could bring

to bear in any crisis, circumstance, or situation. It had the power, authority, and resources

to bring all of the hatred, the phony claims and the racially hostile clamor to an immediate

and abrupt halt. It had the power, authority, and resources to protect Morgan.

164.    Instead, The University of Virginia, its President, and its then-Dean of Students chose to

use all of those instruments and its vast power to harm Morgan, to bully Morgan, and to

ruin Morgan, and they did so because of her race.

165.    The University of Virginia was chartered by the Commonwealth in 1819 and founded

through the efforts of Thomas Jefferson, who served as the University's first Rector.

Former United States President James Madison served as the second Rector upon Thomas

Jefferson's death. Since its conception, founding, and construction, the University of

Virginia's primary campus, called "Grounds," is located in Charlottesville, Virginia.

Though located entirely within the independent City of Charlottesville, the University's

"Grounds," being Commonwealth property, falls, for the most part, within the jurisdiction

of Albemarle County and its police department, rather than the City of Charlottesville or

the Charlottesville Police Department.

166.    The University of Virginia community considers the University of Virginia to be a unique institution and its original Grounds a sacred, and, to some, spiritual place – a place without equal in many regards; a public school that occupies a position of prominence not only in the annals of American history but remains relevant in many aspects of the current national discourse.

167.    Over the past two centuries, the University of Virginia has evolved into a massive, powerful, politically influential, and enormously wealthy enterprise. Despite being a public entity, the size of its endowment alone places it among the richest universities in the country – public or private.

168.    The list of famous, ultra-wealthy, and powerful faculty and alumni includes "tech billionaires," "hedge-fund billionaires," titans of industry and finance, politicians, legislators, federal and state judges, military heroes, major mainstream media personalities, hall of fame athletes, major league sports owners, and even Hollywood celebrities. The University and its faculty do not mind throwing their weight and even their affiliation with the University around partisan politics and political races for office, sometimes drawing the ire of the electorate. The relevance of this is that not only does the University of Virginia wield immense power and carry a potent influence – it knows it.

169.    The University of Virginia employs over 28,000 people and the school's current undergraduate and graduate student body approximates 25,000 people. The University is a labyrinth of departments and divisions that frequently overlap and sometimes contradict one another in terms of policies, duties, and outcomes. Within this complex maze, the University has numerous instruments and instrumentalities that it selectively brings to bear to an issue or controversy, when it so chooses.

170.    The University has its own law firm, the Office of University Counsel, which is supported and staffed by the Attorney General of Virginia. The University deploys lawyers to fill numerous roles in controversies such as this. The lawyers are seasoned litigators, familiar with both our state and federal courts and the state and federal laws governing the University. Beyond the University's own law firm in the Office of University Counsel, many University divisions and departments have their own, separate "legal counsel" and "special advisors." The University administration readily deploys these lawyers to coordinate and participate in a multitude of roles in student disciplinary proceedings, human resources investigations, and civil rights incidents, among other matters. The cadre of lawyers is no friend to students who find themselves in The University's unhappy glare.

171.    The former Dean of Students and President, both of whom are lawyers themselves, may call upon the University's own law firm, while enjoying the support, advice, and counsel of numerous other lawyers and "special advisors," who appear to be separate and distinct from the Office of University Counsel.

172.    The University of Virginia has its own police force, including no less than seventy-five sworn police officers and sixty-six security officers. In addition to the University Police Department, within the University's Department of Safety and Security's ambit and oversight is the "Threat Assessment Team" and the "Violence Prevention Committee." The Dean of Students is a member of the University's Threat Assessment Team. According to Defendant Groves, the deliberative processes and decisions of the Threat Assessment Team are entirely secret and totally shielded from discovery or disclosure – to anyone – under a variety of state and federal laws. Those precluded from receiving information from the Threat Assessment Team include the very targets of the "Team" themselves, who may be

under consideration for punishment, banishment, and being branded, sometimes falsely, as "threats to the community."

173. Another instrument wielded or restrained at the discretion of the University's senior leadership, including the Dean of Students and the President, are the University Judiciary Committee and its concomitant Judicial Review Board, both "housed" within the Division of Student Affairs – under the supervision and management of the Dean of Students and ultimately, the President. The University Judiciary Committee entity enjoys the same privileges and status as the Student Council, discussed above, and is thus simply another arm of the University. The "UJC" as it is called, has its own full-time, professional legal counsel and "special advisors" who are University employees, not students. Like so many other aspects of University of Virginia life, the UJC is shrouded in secrecy, and the Administration guards and shields every facet of the UJC's processes and decisions from disclosure through reliance on federal and state student records privacy laws, along with attorney-client privilege principles. The UJC and its processes have been the frequent subject of due process challenges in court.

174. Yet another instrument at the University leadership's disposal for the investigation and punishment of University community members, mostly students and employees, is the Office of Equal Opportunity and Civil Rights or "EOCR." Like the other instruments, this unit's work, investigations, evidence, and conclusions are considered secret and confidential, unless the EOCR and the Administration choose otherwise.

175. These apparatuses employ hundreds of people, only a few of whom are students. Many of those employees serve as "investigators" in one form or the other, whether that word is included in their title or not. The administrators, including President Ryan and then-Dean

of Students Groves, and the investigators conduct themselves as if they are beyond reproach and accountability for their actions and decisions, because, for the most part, they are.

176.    The high-ranking administrators and the people who wield these instruments of power and influence utilize many tactics to avoid scrutiny. These include the use of lawyers under a claim of privilege, reliance on student and employee privacy laws, *even when it is a student or employee who has been wronged*, and then, in the rare occasions that a student or employee has the temerity to bring a lawsuit, the University and its officials fall back on the defenses of sovereign and qualified immunity in another attempt to avoid the merits of the cases against them being adjudicated.

177.    The administrators and investigators routinely, if not universally, deny students and employees the right to be meaningfully represented by counsel, not because it is proper and fair, but because they can. However, the administrators and investigators frequently call upon their in-house, or even privately hired trained litigators and trial counsel to advise them and take part in the investigations and proceedings but deny the accused the right to have their lawyer present for many of the interrogations and deny the accused the right to have an equally trained litigator or trial lawyer fully participate in the proceedings and defend their rights. The University President will selectively waive the attorney-client privilege when it suits the Administration's narrative in publicity campaigns to garner support for an unpopular decision – otherwise, it is a sealed vault. Most of the time, evidence, including exculpatory evidence, is hidden behind a wall of silence and shrouded in total secrecy.

178. The President of the University, Defendant Ryan, has the full authority and power to initiate, limit, alter, modify, or terminate altogether any investigation or disciplinary process of any University apparatus or instrument.

**D. THE UNIVERSITY OF VIRGINIA – THE CULTURE & ENVIRONMENT OF RACE.**

179. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

180. The University of Virginia is widely considered to be a nationally preeminent public university that, according to its President, strives to be "both great and good" for the people of the Commonwealth of Virginia. The University of Virginia boasts of many schools, departments, and centers dedicated to just that purpose: studying, promoting, and nurturing democracy, democratic governance, good politics, and sound government.

181. By operation of law as well as its own principles, policies, and announced mission, among the University of Virginia and its officials' prime directives is the preservation and protection of its constituency's most sacred civil rights, which include those clearly established, federally protected constitutional rights embodied in the Bill of Rights. Simply put, the University of Virginia and its officials are bound to not only observe but obey the law, even those that do not fit its senior leadership's political ideologies. These educators and administrators are also obligated to do everything in their power to protect University students from being victims of violations of those laws and must themselves tread lightly and with extreme caution before the University engages in any practice or act that could possibly infringe upon, suppress, or violate those rights.

182. However, the University of Virginia has a troubled and tumultuous history when it comes to questions of the civil rights of its students and faculty and the separate, sensitive subject

of race. The University and its officials have been embroiled in more than a few civil rights controversies involving the deprivation of students' Free Speech and Equal Protection rights in which race and racial issues played a central role.

183.    To be sure, there is no issue at or involving the University of Virginia that has attracted more attention and controversy than the sensitive subject of race.

184.    Under Defendant Ryan's administration, the University has developed what might be termed an obsession with race, racism, and racialist policies and ideologies. That institutional obsession, directed and implemented from the highest levels, has led to the creation, tolerance, and reinforcement of a widespread and pervasive culture and environment of rampant race-based prejudice and bias as well as disparate treatment, discrimination, and harassment on the basis of race.

185.    Interestingly, the culture of racial disharmony appears to be equally unpopular among all constituents, irrespective of their race.

186.    The following are but a few examples of the environment and culture that students, faculty, alumni, and even visitors experience on a constant and pervasive basis:

A)      the University's professional and graduate schools employ racially discriminatory practices in their respective admissions decisions. The decisions to admit or reject an applicant have been motivated and influenced positively and negatively by the applicant's race. Those practices have been declared to be illegal and unconstitutional. On at least three occasions over the past year, anticipating that the United States Supreme Court would rule that racial discrimination in admissions is still racial discrimination and violative of Title VI and the Equal Protection Clause, President Ryan has taken to the airwaves, print media, and social media to lambaste

the Court and the projected decision and vowed to continue pursuit of the same objectives that have now been deemed illegal, but somehow, "of course," doing so while following the law. The published statements are themselves strong evidence of the President and the University's comfort with racial discrimination and an expression of defiance that is both hostile to the interests of the University and the Commonwealth and illustrative of discriminatory animus and intent;

B)      the University hosts racially segregated reunions;

C)      the University hosts and promotes other alumni, student, and faculty programming and offerings that are segregated on the basis of race;

D)      the University and its "affiliated" foundations, which receive University funding, expressly employ racial preferences in their hiring and selection practices, and these practices are well-known to the upper echelons of the University hierarchy;

E)      the University offers and rations programming and student success resources on the basis of race, excluding some students from the benefit of these programs based on their race;

F)      through its "affiliated" foundations, the University offers prestigious scholarships that bestow elaborate and extensive programming and benefits exclusively on the basis of race. President Ryan has publicly and openly admitted that one of the reasons he supports such foundations is their ability (and willingness) to do on behalf of the University what the University legally and constitutionally cannot;

G)      University students routinely host racially segregated events in University facilities in which University staff members are told to "look the other way" regarding the

illegal practices and to manipulate student key card access so that students can be admitted or denied access on the basis of their race;

H)      prestigious, competitive student organizations hold racially segregated seminars and preparation sessions to assist and promote certain students' candidacy and applications, excluding certain students on the basis of race;

I)      prestigious, competitive schools or areas of major study within the University hold racially segregated seminars and preparation sessions on the basis of race to assist and promote certain students' candidacy and applications, excluding certain students on the basis of race;

J)      supervisors in important University divisions and departments hold racially segregated meetings and racially segregated social events. Employee experiences include being told that employees of a certain race are not allowed to speak nor will their opinions be heard or tolerated in the University work environment;

K)      reports have surfaced in the media regarding the practice of forcing applicants for employment or advancement in some University departments, schools, and divisions to pledge their allegiance to racialist ideologies and affirm their belief in racially discriminatory policies and philosophies in order to be considered for the position or promotion;

L)      members of the public and University employees and students experience racially offensive and demeaning comments such as tour guides telling audiences, within the hearing of employees and students, that people of a certain race, including certain administrators and faculty, "cannot be trusted" because of their race;

M)      members of the University faculty and administration frequently post and publish offensive and hostile comments and statements that are racial in nature, creating a racially hostile environment and a culture of racial harassment; and

N)      students have been subjected to taunts, threats, and instances of actual violence on the basis of race, which constitute hate crimes under Virginia and federal law, without any response for action taken from President Ryan or his administration;

O)      students and faculty of certain races report living and operating in fear of being singled out, retaliated against, punished with low grades, defamed, or even threatened with physical injury on the basis of their race.

187.    The University of Virginia's tolerance of and steadfast refusal to acknowledge and eliminate these prejudicial and illegal behaviors has only served to worsen the environment and culture of racial harassment and hostility on Grounds.

188.    The University of Virginia cannot identify evidence of incidents and the administration's response that disprove disparate treatment on the basis of race for expressions of speech, publication of statements, or the utterance of words.

189.    The University of Virginia cannot identify evidence of incidents and the administration's response that disprove disparate treatment on the basis of race for harassment or discrimination.

190.    The unequal application of policies and practices is discriminatory and illegal and also has the effect of further elevating racial harassment and discriminatory practices on Grounds.

191.    Under Defendant Ryan's administration and leadership, the University has fostered a culture that promotes and tolerates racial harassment, racial discrimination, and racial hostility.

E.      **THE UNIVERSITY OF VIRGINIA – DISPARATE TREATMENT ON THE BASIS OF RACE.**

192.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

193.    The University maintains a strict code of silence and shroud of secrecy over as many of the events that involve claims of discrimination and/or deprivations of community members' civil rights as it can.

194.    The following are but a few examples of substantially similar facts, issues, and circumstances where the outcome and University's actions differed on the basis of race. These examples are sufficient to demonstrate the Administration's discriminatory intent and willingness to discriminate on the basis of race:

A)      On or around February 12, 2020, a Black woman disrupted the recently opened Multi-Cultural Center in Newcomb Hall on University Grounds, while school was in Spring session. In a loud voice, the woman interrupted students occupying the space:

> Public Service Announcement! Excuse Me! If y'all didn't know, this is the MSC, and frankly there's just too many white people in here, and this is a space for people of color, so just be really cognizant of the space that you're taking up because it does make some of us POCs uncomfortable when we see too many white people in here. It's only been open for four days, and frankly there's the whole University for a lot of y'all to be at, and there's very few spaces for us. So, keep that in mind. Thank you.

The statement appears to violate several provisions of both the Student Code of Conduct <u>and</u> the University's Preventing and Addressing Discrimination and Harassment Policy. Many students and members of the community were deeply hurt and offended by the woman's statement that "there are too many white people

in here" and "we see too many white people in here," and alerted the University of their concerns. As far as the Plaintiff and the public know, the University, President Ryan, and Defendant Groves <u>did not</u>:

(1)     "condemn" the speaker or her racist, segregationist message, nor did it promise to "investigate" or even characterize the statement for what it clearly was, a racist demand that students be banned from a University facility based on the color of their skin;

(2)     convene the Threat Assessment Team or the Violence Prevention Committee;

(3)     initiate any proceedings before the University Judiciary Committee;

(4)     initiate any proceedings before the EOCR;

(5)     involve the University Police, the Albemarle County Police, or the Federal Bureau of Investigation;

(6)     conduct any investigations into the matter;

Instead, President Ryan published a comment to his widely-shared "@PresJimRyan" Twitter account:

> There has been a lot of traffic about the incident at the MSC. To be clear, the MSC is for all students. But there is more to say than can be communicated in a short statement on social media, and I'm working on an essay for the @cavalierdaily so for those interested, stay tuned.

President Ryan then penned an article for the Cavalier Daily, which was broadcast widely in the UVAToday online magazine entitled "Toward a Shared Sense of Purpose and Community." In the article, neither the President nor the University took issue with the racially hostile nature of the woman's behavior, and in fact, the

53

President's criticisms and consternation were reserved for the members of the community who complained about the woman's offensive and unwelcome misconduct at the student facility: To be sure, President Ryan claimed that it was those complainants, rather than the woman who uttered the racially offensive statements, who were the racists. The President stated that his views "don't fit neatly into either camp." The University took no action of any kind.

B)   In the late summer of 2020 at the beginning of the school year, just as Morgan Bettinger was being vigorously persecuted for uttering fifteen words during an off-campus protest, another racial controversy erupted on Grounds: the "Lawn Room Sign Incident." A "Fourth Year" student and Lawn Resident who calls herself a "Muslim Person of Color" painted a vulgar and racially offensive mural on her Lawn Room doors, causing an uproar that went well beyond the University, and even the country. The words "FUCK UVA" were emblazoned in red, followed by phrases including "KKKops," "GENOCIDE," "SLAVERY," and "BLACK * BROWN LIFE." Visitors, townspeople, students, faculty, and even administrators were upset by what appeared to be racist, vulgar vandalism of a major international historical landmark. Most thought that the Lawn Resident would be charged with some form of vandalism, at the very least. Many complaints were brought to the University's administration. National and international news outlets picked up the story, waiting to see what the University and its President would do. The answer? "Nothing." As far as the Plaintiff and the public know, the University, the President, and the then-Dean of Students <u>did not</u>:

(1)  "condemn" the signs or the resident, despite frequent admissions that the signs were "offensive;"

(2)  "condemn" the speaker or her racist messages and images;

(3)  convene the Threat Assessment Team or the Violence Prevention Committee;

(4)  initiate complaints or proceedings before the University Judiciary Committee;

(5)  initiate complaints or proceedings before the EOCR;

(6)  involve the University Police, the Albemarle County Police, or the Federal Bureau of Investigation; or

(7)  take any action at all;

President Ryan did, however, invite the Lawn Resident to speak with him – a privilege he has yet to afford Morgan Bettinger. The Lawn Resident and another person recorded their call in which they needled, cajoled, and, some might say, humiliated the President of their University. Then the Lawn Resident published the recording online in further embarrassment of the President. Again, the University took no action whatsoever, even though large groups of influential alumni formed formal associations as a result of this controversy and promised to withhold donations unless the offensive signs were removed from public property. In an unusual and unprecedented move, President Ryan published a legal opinion supporting his refusal to take any action from his then-University Counsel stating that the Lawn Room signs constituted untouchable free speech. The University did nothing.

C)     Sometime in the Winter of 2020-2021, while two of the three Morgan Bettinger investigations and proceedings were still underway, while she was constructively suspended and expelled, including the specter of being denied her degree, a group of White and non-Black minority students corresponded and communicated extensively with President Ryan, Dean Groves, and the Board of Visitors regarding racial abuse, cyber-bullying, harassment, and threats of violence against them on the basis of their race and their political ideology. One of the students, a First Year or freshman classmate of the teenaged activist at the center of this lawsuit, reported to President Ryan that he had been physically threatened and intimidated. The student and other students prepared detailed letters and multi-media presentations setting out instances of harassment against them. The University did not conduct a Threat Assessment Team Investigation. The University did not initiate a Judiciary Committee investigation or proceeding. The University did not initiate an EOCR investigation. The University did not involve the police or the FBI. As far as the Plaintiff and the public know, President Ryan, the Board of Visitors, and the University refused to take any action or protect these male and female students. Importantly, the teenager who perpetrated the hoax at the heart of this lawsuit was deeply involved in many of the interactions that formed the basis of the students' complaints, conclusively demonstrating that the University was taking no action whatsoever to halt or even slow her abusive behavior and was instead empowering her to continue doing so.

D)     Around the same time, meaning Winter Break or early Spring term of the 2020-2021 school year, a "person of color" editor of the Cavalier Daily, which is one of,

if not the most prominent and powerful organizations in the University, posted and published the statement "Abolish white people (except Bill Nye)" on social media. The University did not conduct a Threat Assessment Team investigation. The University did not initiate a Judiciary Committee investigation or proceeding. The University did not initiate an EOCR investigation. The University did not involve the police or the FBI. As far as the Plaintiff and the public know, President Ryan, the Board of Visitors, and the University did not acknowledge, respond to, or take any action of any kind regarding this racially hostile and offensive threat.

E)   During that same period, while Morgan Bettinger was still mired in the midst of two of the University's three investigations and proceedings against her, the Lawn Resident sign-maker took down her signs. Though the community breathed a sigh of relief, their comfort was short-lived. When she returned, the Lawn Resident posted an even more elaborate and even more racially offensive painting, this one depicting the Grim Reaper overlaid on a hooded Ku Klux Klansman, all surrounding the University Rotunda pictured as being engulfed in flames. The sign read "In order for non-violence to work, your opponent must have a conscience. UVA HAS NONE! BURN IT ALL DOWN." Despite the obvious racially hostile message and imagery, despite the reference to and call for violence, the University did not condemn the conduct or the painting. The University and its President did not take to Twitter to assure the community that an investigation was underway. The Lawn Resident was not "doxxed," threatened, banished from Grounds, or humiliated by teachers and peers. Instead, President Ryan politely asked the Lawn Resident to voluntarily remove the signs, which he characterized as *incitement to*

*commit violence*. President Ryan promised to *consider* terminating the Resident's Lawn Room privileges if she did not comply. Again, no actions were taken against the Lawn Resident, despite multiple complaints of racial offense and suggestions of violence, and the University, again, did nothing: No Threat Assessment Team investigations; no UJC complaints, investigations, and trials; no EOCR investigations or proceedings; no police or FBI involvement, and no punishment or disciplinary measures at all. The University certainly didn't constructively suspend or expel the Lawn Resident.

F)    Sometime in the Fall semester of 2022, a Black female student smashed a window at the Office of African American Affairs – apparently in a targeted attack against a specific faculty member. The University community was not given any information about the identity of the attacker. Despite immediate community-wide outrage and fear that the attack was racially motivated or a hate crime, or both, the University was curiously silent and inactive. President Ryan and his administration would only say that the "person was someone known to the Office of African-American Affairs" and that they did not believe the vandalism or violence were race-related. They did not explain why being "known to the Office" would eliminate the prospect of a hate crime or racially motivated attack, unless one concludes (as everyone quickly did) that because President Ryan and his administration knew the attacker's race, they either decided  that the attack could not constitute a hate crime or racially motivated attack (which is pure racial stereotyping and disparate treatment at its very worst) or they were not going to pursue investigations, proceedings, or charges against the attacker because of her

race (which constitutes disparate treatment on the basis of race at its very worst). Either way, the University's behavior regarding this incident is strong evidence of its racial animus and its comfort discriminating on the basis of race. As far as the community knows, to date, no action of any kind was taken regarding this clear violation of multiple student codes and policies. As far as the Plaintiff and the public know, the University did not conduct a Threat Assessment Team Investigation; The University did not initiate a Judiciary Committee investigation or proceeding; The University did not initiate an EOCR investigation; The FBI was not brought into the matter. President Ryan and the University's Twitter accounts did not include condemnations of the student or her violent behavior. In fact, as far as the Plaintiff and the public know, President Ryan and the University did absolutely nothing.

G) Around the same time as the rock-throwing attack, a White person totally unconnected to the University snuck onto Grounds in the middle of the night and hung a noose or noose-like rope on the Homer Statue on Grounds. President Ryan and the University were quickly able, through surveillance footage, to determine the race of the individual who committed the act. Immediately, press releases, Twitter condemnations, web-alerts, and University-wide proclamations of anguish and outrage were published and broadcast. The Threat Assessment Team was activated. The University called upon the Albemarle County Police and the Virginia State Police and the Federal Bureau of Investigation to investigate, apprehend, and prosecute the perpetrator. President Ryan published frequent updates and press releases regarding the University and University Police Department's cooperation

with the FBI, the Albemarle County Police Department, and Virginia State Police. A reward of $10,000 was posted for information. Nearly every University organization or affiliate immediately publicly published some form of condemnation. President Ryan and most of the senior leadership of his administration met with Black students and community members frequently to allay their fears and discuss the University's response. At some point, the individual was arrested and charged in Albemarle County Circuit Court with felony hate crimes.

H)      Later, a University employee[5] was subjected to much of the same treatment experienced by Morgan regarding an incident that occurred while the person was performing their duties fully within the course and scope of their employment with the University. The employee reported being a victim of racial harassment, cyber-bullying, "doxxing," defamation, and death threats on the basis of their race by several students who were "persons of color." The employee's family was "doxxed," and their private information was broadcast on the internet. Several of the students involved in the harassment were reported to be lurking in front of the employee's office on a daily basis in the weeks after the incident. The employee's complaints were immediate and included the production of evidence of the actual racist threats and abuse to their supervisors and Human Resources. The entire chain of command and senior administration leadership, including President Ryan, his

---

[5]      The University employee's name and identity are known to undersigned counsel and are being kept confidential to protect them from retaliation. This employee remains employed by the University and genuinely fears retaliation from the University and the University community for providing truthful testimony or information in this matter. For that and the other reasons mentioned above, the Plaintiff has not named or used any identifying information regarding the employee but is prepared to disclose the information if required to do so by the Court.

Office, the Student Affairs Division, Human Resources, the EOCR, and Office of University Counsel were on actual notice of and fully aware of the abuse and the employee's complaints. The University's only action to protect the employee was advising them to "use the buddy system" when they were in public and in fear for their life and safety. On the other hand, the same University apparatuses opened investigations into the employee in open and obvious retaliation for their complaints. The two students who lead the false and malicious campaign were not subjected to any proceedings and were allowed to graduate with their student records entirely intact and untarnished. The employee was subjected to two months of administrative leave, a temporary "No Trespass Order," and the threat of losing their job before they were transferred to a different location under different supervisors. The University claimed to have fully restored their position with a perfectly clean record, but only after the two students graduated and were long gone from Grounds. No action of any kind was taken regarding the racial harassment or threats.

195.   These examples of disparate treatment are yet another form of proof and evidence of racial animus and discriminatory intent.

**E.      THE UNIVERSITY OF VIRGINIA HEARS THE MOB'S CALL TO ACTION.**

196.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

197.   The University of Virginia, Defendant Ryan, and Defendant Groves knowingly subjected the Plaintiff to a thirteen-month long process of persecution followed by the permanent unconstitutional impairment of her reputation and formal student records, all because of

race and because of Morgan Bettinger's race. But for Morgan Bettinger's race, these Defendants would not have taken the adverse actions against her nor would they have refused to provide her with the benefits and rights to which she was entitled as a University student and member of the community.

198. Among other actionable acts, errors, and omissions that breached Morgan Bettinger's federally protected rights, the Defendants wronged Morgan Bettinger in the following ways, on the basis of her race:

A)   adopted, validated, ratified, augmented, and most of all amplified the teenaged activist's maliciously false and racially motivated campaign against Morgan Bettinger;

B)   without any legal or factual basis, but motivated by race, conducted a Threat Assessment Team investigation of whether Morgan Bettinger should be considered to pose a threat of imminent violence or harm to the community as a result of her fifteen spoken words (resulting in the "Team" (including Defendant Groves) concluding that Morgan was not and did not pose a threat to anyone). At the same time, the University and Defendants Ryan and Groves expressly declined and refused to conduct a Threat Assessment Team investigation into the numerous threats of death and violence against Morgan Bettinger and her family that were posted by students and other known members of the community in writing;

C)   without any legal or factual basis, but motivated by race, initiated, conducted, and tampered with the University Judiciary Committee and Judicial Review Board "investigations," hearings, sham trials, and utterly bogus "reviews" that were entirely devoid of any constitutional or legal legitimacy, starting from July 2020

and lasting well into April 2021. Morgan would not know until the day before her graduation whether she would be allowed to take part in her graduation ceremony and would not know until August 10, 2021, whether the University would withhold, withdraw, or rescind her degree and/or whether the University would continue to impair her degree and her permanent record with the "Disciplinary Expulsion" notations and other unconstitutional impairments;

D)   without any legal or factual basis, and motivated by race, initiated and subjected Morgan Bettinger to a year-long "Civil Rights" investigation that would ultimately result in her total exoneration; the EOCR expressly and impliedly held the power to withhold or rescind (or recommend to President Ryan the withholding or rescission of) Morgan Bettinger's degree and expel her from the University, even, it has been suggested, retroactively;

E)   without any legal or factual basis, and motivated by race, subjected Morgan Bettinger to faculty interrogations and multi-student shaming ordeals; and

F)   created, tolerated, and reinforced an environment of constant fear of death, bodily injury, bullying, and abuse on the basis of her race and categorically refused to do anything whatsoever to protect Morgan or even inquire if she was safe and healthy.

199.   The University's first concerns and actions should have centered around Morgan and her family's physical protection, safety, and well-being.

200.   The University did nothing.

201.   The University publicized and broadcast the teenager's false accusations and then publicly condemned Morgan and her "threats" across various media and platforms and in different

ways – including of course social media but also including email condemnations from professors to multiple classes of cohorts.

202.   At some point soon after the Friday evening incident, the teenager managed to retain a litigation partner in one of Charlottesville's largest, oldest, and most prestigious law firms to represent her. At least one of the teenager's lawyer's law partners previously worked for the University handling civil rights investigations and in private practice, that same law partner is routinely hired by the University to participate in civil rights proceedings and adjudications, all of which touch upon or are directly involved with the Division of Student Affairs and the Dean of Students.

203.   At the same time, President Ryan, Dean Groves, and the University administration and even faculty members were receiving multiple, frequent demands from all quarters calling for the University to skip right to the ultimate punishment: expulsion.

204.   During the pendency of the University's proceedings against Morgan, the University Police, who would have been required to alert the President of the University and the Dean of Students, received credible reports that if the University failed to convict and expel Morgan Bettinger, the teenager and her followers planned to riot, with plans to disrupt and cause mayhem on Grounds. The threat was specific: the targeted event was a football game against Duke University which would be a major University event, assumed to be nationally televised, in the University's Scott Stadium. The details included the activists' plans to have masses of protesters lie down in front of Duke University's team buses, preventing them from entering and traversing Grounds to the stadium, and thereby causing untold problems and potential economic damages to the two universities and hundreds of involved players and other participants. Importantly and giving credence to the reports, the

Virginia versus Duke football game was scheduled for September 26, 2020, the day after the University Judiciary Committee's "trial" that it planned to stage on the evening of September 25, 2020.

205. The message to the University was clear, the message was ominous, and the message was received: Destroy Morgan Bettinger, or else.

206. The University purposefully initiated no less than three investigations and adjudicative processes against Morgan Bettinger that would begin on July 18, 2020, and continue until August 10, 2021.

207. President Ryan and his office remained closely involved in and monitored each development and the progress of each of the University's efforts against Morgan Bettinger.

208. Defendant Groves was intricately, intimately, and extensively involved in every aspect of the persecution and prosecution of Morgan Bettinger, including the University decisions not to protect her from the moment the events occurred until he left the University at the end of June 2021.

209. Defendant Groves purposefully tampered with at least two of the "proceedings:" the Threat Assessment Team investigation and the UJC "prosecution." Then-Dean Groves, obligated to act in Morgan's best interests, is alleged to have presided over both investigations in his official role as Dean of Students; is alleged to have advised the UJC representatives and officers about Morgan's case and its handling and disposition, is alleged to have personally initiated a complaint, himself and on his own behalf, against Morgan with the UJC, is alleged to have interfaced and communicated with the Office of the University Counsel and assisted with helping or encouraging the University Counsel to assist both the UJC and its "trial panel" with Morgan's prosecution, is alleged to have engaged unidentified "law

professors" from the University's Law School to advise him about Morgan's case and her First Amendment protections, is alleged to have interfaced with the "Vice Chair for Trials" for the UJC, including claiming to have "teed up" Morgan for "trial;" and is even alleged to have participated as a witness against Morgan at her so-called "trial." The Dean of Students for the University of Virginia did not simply put his proverbial thumb on the scales of justice, he put his entire weight on it.

210.  How this openly hostile and wantonly unfair behavior could be warranted or excused is difficult to fathom.

211.  Because of race, President Ryan and Dean of Students Groves failed, and in fact refused to:

A)  publish any warning or pleas to the University community regarding Morgan's rights, her health, her safety, or the presumption of innocence;

B)  condemn racial harassment, bullying, and death threats against Morgan;

C)  investigate or prevent racial harassment, bullying, and death threats against Morgan;

D)  engage or activate the Threat Assessment Team to determine whether the activist's or her followers' hateful threats and abuse were worthy of investigation or protection;

E)  instruct University administrators and faculty members not to predetermine Morgan's fate, retaliate against her in any way, or punish, discipline, or abuse her;

F)  seek University Counsel's or the ring of five special legal counselors' advice and counsel regarding the constitutionality of punishing Morgan's speech;

G)  intervene to prevent or terminate the unconstitutional proceedings;

H) review all of the exculpatory evidence exonerating Morgan and disproving the teenager's falsehoods and lies;

I) (as to President Ryan) personally interview or offer to interview or speak with Morgan Bettinger as he did so readily with other students who did not share Morgan's race. In fact, President Ryan has never met or spoken with Morgan Bettinger or her family;

J) But for race, specifically Morgan Bettinger's race, these Defendants would have rendered and taken exactly opposite decisions and actions that they did.

212. The University initiated a Threat Assessment Team investigation against Morgan. That "Team" investigation concluded that Morgan Bettinger did not pose a threat to the community or anyone in it. This conclusion was reached in late July or early August 2020, almost a full year before the University's 100+ page final report totally exonerating Morgan Bettinger was delivered to President Ryan.

213. Defendant Groves and President Ryan also subjected Morgan to an absolute farce of a "judicial proceeding" before the University Judicial Committee or "UJC" and an utterly lawless "review" before the Judicial Review Board, that included among its members a constitutional law professor at the University's Law School who was one of Dean Groves' and President Ryan's teachers and a former colleague of President Ryan's.

214. In a phony show trial that would have made even Robespierre avert his eyes, a jury of five undergraduate students, with no legal training and no right whatsoever to render decisions regarding the constitutional protections to be afforded a student's speech, delivered a verdict of "guilty" sometime at 3:30 AM in the morning on September 26th – the day of the football game against Duke University at Scott Stadium.

215.    The absurdity of the "trial" and the entire process is evident in the "verdict" itself:

> We the judges of this trial panel find that your actions on July 17th were shameful and put members of the community at risk. You yourself acknowledged saying "it's a good thing you are here because, otherwise, these people would have been speed bumps." Given the tragic events of August 12 and the context in which you uttered these words, you disregarded Charlottesville's violent history. A history you should have been cognizant of as a UVA student and resident of Charlottesville. During these proceedings you have shown no understanding of the risk this statement posed.

216.    Putting aside the sanctimonious tone of their "judgment" and the dubiousness of college kids posing as high-priests of a racial justice inquisition when a young woman's most sacred constitutional rights were at issue, the moral illegitimacy of the entire "UJC" process is borne out in the "jury's" "verdict" and its "sanctions," which bear no connection whatsoever to violence or "true threats:"

> Conduct 3 meetings with [an African-American professor in the Batten School of Leadership] in which you will discuss the history of police community relations to broaden your understanding.

> 50 hours of community service to be completed by May 1. These hours will be completed with an organization that will help you better understand the context of Social Justice in America. You will be contacted by 2 weeks from today to discuss potential organizations to partner with for the completion of service.

> Write an apology letter to [the teenager] acknowledging the harm your actions posed to both her and to the UVA community.

> We sanction you to expulsion in abeyance if you return to the UJC and are found guilty of a second standard 2 charge.

217.    Nowhere and at no time did the Threat Assessment Team, the UJC, the EOCR, or the University faculty act or treat Morgan as if she posed any threat to them – no security was present during her trial, for instance. Nowhere and at no time did the Threat Assessment

Team, the UJC, the EOCR, or the University faculty suggest or order Morgan to attend anger management or violence prevention classes, for instance.

218.	Morgan did not convey a threat. Morgan did not pose a threat. Morgan was not a threat.

219.	Instead, because of her race, because of the race of the teenaged accuser, and because of racial politics, Morgan was pilloried for not showing sufficient awareness of "Charlottesville's violent history."

220.	The "Charlottesville's violent history" refrain is a legally and logically bankrupt basis upon which to base the deprivation of Morgan's rights of Free Speech, but that's just what President Ryan and Dean Groves tried to do when they launched this effort against Morgan Bettinger. Certain famous University of Virginia Professors who live in "Pavilions" on the vaunted "Lawn" in the "Academical Village," have said that they can never look at UVa's Lawn or the town of Charlottesville the same way after the "Unite the Right" rallies and violent clashes on August 11 and 12, 2017. President Ryan himself, though ensconced far away in Cambridge, Massachusetts at the time of the rallies, would, when he accepted the presidency of the University a year later, state in the press that, "he just had to come back" *because of* the Unite the Right rallies. Dean of Students Groves is reported to have been physically injured and thoroughly traumatized by the rally on the evening before the cataclysmic protests.

221.	While some people may drive through Charlottesville, or downtown Charlottesville, or walk "the Lawn," and recall those horrible events, many people in this community and visitors to it simply do not. When Morgan hears the date "August 12," she thinks of one thing and one thing only – the day her father died. Why the Defendants and the UJC "trial

panel" (comprised of arrogant and disrespectful[6] undergraduates) thought that the girl from the County who was an eighteen-year-old community college student at the time of the "violent history" would have been, at that very moment, thinking of that "violent history" is truly the height of myopic self-righteousness.

222. Within one week of the University's "condemnation" of Morgan and the false mischaracterization of her speech as a "threat," without speaking with Morgan or reviewing any evidence, every student in the Class of 2020, 2021, and 2022 "cohorts" of Political Philosophy, Policy, and Law Program in the College of Arts & Sciences received an email from the Program Director stating, among other things, that Morgan's speech must be "unconditionally condemned."

223. During the weeks to come, Morgan would be forced to meet with faculty members of her department without counsel present and compelled by those professors to attend two "Zoom" sessions with members of her Political Philosophy, Policy and Law cohort. During the multi-hour sessions, Morgan was humiliated, excoriated, and shamed. Morgan was told by one student, with approving applause from the others, that sitting in class with her, even through a computer screen on Zoom, was the equivalent of the student being forced to sit in a room "with her rapist." Morgan was told by the students in her cohort that in order to be allowed to attend class, she would have to prove that she wasn't a racist. Morgan insisted that she was innocent and that they didn't know the full story, which prompted them to inform the teacher that she should not be allowed to attend classes, even online through Zoom. Ultimately, due to the students' predetermination that Morgan was guilty (some of

---

[6]     One need only read the written communications between the UJC and Morgan or Morgan's counsel, a retired criminal defense lawyer working on a *pro bono* basis, a Navy fighter pilot who flew over 100 combat missions in Vietnam, to viscerally feel the disdain and disgust that these University students exhibited towards Morgan and her advisor.

the students were also members of the UJC – one was a "UJC Senior Support Officer" who was involved to some degree in Morgan's UJC proceeding that was ongoing at the time), Morgan was forced to attend her classes in an "asynchronous" format, which is fancy way of saying that she was forced to watch lectures on YouTube without the benefit of any class participation.

224. The University initiated a formal complaint process with the EOCR, even though no credible or trustworthy evidence had or has ever been produced supporting a claim or suggestion that Morgan engaged in any racial harassment or race-based conduct at all.

225. The University, President Ryan, and Defendant Groves would not have taken these actions and would not have allowed these actions to be taken against Morgan Bettinger but for her race.

226. The University has never explained why it initiated three separate processes involving multiple investigators, interviews, reviews of evidence, and adjudication, and the University has never explained why these processes took thirteen months to complete.

227. The investigations, analyses, and deliberations over Morgan's fate – whether she would be allowed to attend her graduation ceremony, whether she would receive her degree, whether her permanent record would forever be stained with illegal and unconstitutional negative notations, lasted thirteen months.

228. Even when the University and Defendants Ryan and Groves knew of a positive development or uncovered facts that would be favorable to Morgan, they either refused to provide that information to Morgan or withheld the information while they sought additional "reviews" and "approvals" by numerous high-ranking administrators and "special counsel" lawyers. This had the practical and very real effect of keeping Morgan

in a constant and continuing state of peril. When asked by Morgan's counsel whether the EOCR had completed its investigation because the EOCR appeared to be beyond its own deadlines for concluding such efforts, the EOCR, knowing that the evidence compellingly demonstrated Morgan's innocence, and knowing that it intended to find and conclude that Morgan was not guilty of the charges against her, would only say that its conclusions were "under review" by senior administrators and lawyers.

229. The day before Morgan's graduation, her lawyer was forced to ask EOCR whether she would be allowed to attend. The EOCR strangely but very tellingly responded that it "has not requested that Morgan's degree be withheld" and indicated that she was free to attend Final Exercises.

230. Prior to that, sometime in the Spring of 2021, EOCR concluded its investigations and rendered its findings in a final report that is thought to be 100+ pages long. The Plaintiff does not know when President Ryan and Dean Groves were "unofficially" made aware of the reports or the EOCR's conclusions, although both Defendants possessed a large body of evidence regarding Morgan's innocence for many months.

231. For reasons that have never been explained or justified, the EOCR contended that while their work was done, their conclusions and findings and the report(s) containing them required multiple additional levels of review and approval.

232. Eventually, sometime in June of 2021, well *after* graduation and during the quiet of summer, when the University had reason to believe that Morgan would be gone from the University forever and the teenaged activist and her followers would be away from Grounds on summer break, the EOCR formally and officially presented two reports to President Ryan – a 100+ page report that has never been produced to the Plaintiff or her

counsel and a six (6) page report summarizing the evidence, the EOCR's conclusions, and the EOCR's decisions regarding the complaints and investigations that had, by then, been pending for nearly a year.

233.   The EOCR's reports fully and completely exonerated Morgan. The EOCR found that Morgan never spoke or acted in a racially discriminatory or harassing manner. The EOCR found that Morgan never threatened anyone, that Morgan was not a threat to anyone, that Morgan's words could not be reasonably interpreted as a threat, that no evidence of threatening intent existed regarding Morgan's state of mind, that the teenager whose claim of being threatened formed the sole basis of all of the complaints and proceedings against Morgan <u>never even heard Morgan speak</u>, and that she admitted her accusations were false and based on "something she may have '<u>misheard</u>.'"

234.   Having been fully and formally apprised of facts and professional investigators' conclusions that Morgan Bettinger was innocent and that, therefore, the University's discipline of her was unconstitutional as a matter of law and, now, public record, President Ryan should have, *sua sponte*, ordered that the University immediately take measures to rectify the deprivations of Morgan's constitutional rights, including the expungement of the negative notations and information in her permanent student record and some form of announcement reversing prior "condemnations" and mistreatment of the Plaintiff.

235.   Instead, President Ryan and Dean Groves remained silent.

236.   President Ryan wasn't about to publicly admit erring or do anything that could appear to be supporting or defending the "racist" "threats" of a "white," "Nazi," "bitch," "Karen" without being forced to do so. Neither was Dean Groves, even though his time on Grounds was coming to an end.

237.    So, President Ryan and Dean Groves let the malicious, racially motivated, University-propagated and amplified lies stand and let the harm and damages to Morgan continue.

238.    The University's and Defendants Ryan's and Groves' decisions to purposefully take no action to exonerate and protect Morgan Bettinger after being provided with notice of the evidence and the investigators' findings were motivated by race, motivated by Morgan's race, and would not have occurred but for Morgan's race.

239.    After receipt of the EOCR's summary report, the Plaintiff timely and appropriately petitioned the only person with the actual and true authority to render, effect, and enforce discipline against her and the only person who was specifically authorized by law to reverse, withdraw, modify, or correct student discipline decisions: Defendant President James E. Ryan.

240.    On August 10, 2021, Defendant James E. Ryan chose to do the exact opposite of the right thing and elected not to observe, honor, and protect Morgan's clearly protected and well-established rights. Instead, President Ryan chose to permanently punish Morgan and forever tarnish her reputation and character, even though he possessed the hard evidence that his decision was entirely devoid of a legal or factual basis. Finally, his erroneous and unconstitutional decisions were motivated by race, motivated by Morgan's race, and would not have been made but for Morgan's race.

## G.    THE RUINATION OF MORGAN BETTINGER.

241.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

242.    Beginning on the morning of July 18, 2020, and continuing throughout the day, every day, with little respite, until the present (1,107 days) and likely for many thousands of days to

come into Morgan's foreseeable future, Morgan has awakened in a state of total abject fear and anxiety. "Is this the day they will find me and kill me?" "Is today the day that I will be burned alive in my car?" "Will someone harass and hurt my mother?"

243.   Morgan and her family were "doxxed" and their identities and personal information were widely broadcast, even the identity of her deceased father. The University took no steps to halt that inhumane treatment of Morgan; in fact, University leaders joined in the effort.

244.   Rare is the day that Morgan's daily life and consciousness aren't cloaked in a dark, deep sense of fear and foreboding. Sometimes, the pain and anxiety are so profound, Morgan spends the day in her bedroom, in darkness, with only occasional visits to the bathroom to throw up. Sometimes, Morgan has a "good day," but more often than not, even those "good days" will be interrupted by a stray comment or even an innocuous event that will remind her of the threats against her and will bubble to the surface of her mind and consciousness, causing her mental and physical manifestations of severe emotional distress.

245.   When Morgan watches the videos of the protesters attacking her and taunting her and banging on her car, the heart monitor on her watch registers an increase from 90 beats per minute to well over 140.

246.   At the time of the threats of death and gruesome bodily injury to Morgan, she was advised by University Police to stay away from Grounds – meaning stay away from the college campus where she went to school and stay away from Downtown Charlottesville or other more populated places in the City – meaning stay from shopping centers or restaurants in the City that was her hometown. Morgan requested that the University provide her with an "escort" or Ambassador or police officer or security guard to accompany her whenever she was required to come onto University property and she felt afraid or in danger. The

University outright denied her request. Instead, the police advised Morgan to wear a mask that covered as much of her face as possible and to wear a hat to cover the rest of her head, all so she could avoid detection. Clearly, the police would not make such recommendations unless they reasonably believed that Morgan was, or could be, in danger. Yet, the University refused to help.

247.   From the moment she awoke on July 18, 2020, to "calls to action" by the teenager and her followers, including prominent University faculty members, for Morgan to be expelled from the University, until President Ryan's unconstitutional and racially motivated adverse decisions against her on August 10, 2021, Morgan carried the constant dread and deep anxiety that she would be expelled from the University and/or that her degree would be refused, withheld, withdrawn, or rescinded. Morgan had worked the better part of her life to become a University of Virginia student and graduate and to secure the prestigious degree from the highly regarded school and program. All of it was torn from her and tossed aside, like her pleas for help, by the University's and Defendant Ryan's and Groves' acts, errors, and omissions, which were unconstitutional and racially motivated.

248.   Morgan was subjected to unspeakable emotional and mental abuse by the University community, most notably the widespread "condemnations" of her and the humiliating and demeaning "struggle sessions" she was forced to attend and where she was bullied, taunted, and mocked. Morgan was socially ostracized by the University community as a result of the Defendants' amplification and validation of the racially motivated campaign against her and the Defendants' ongoing, endless investigations and prosecutions of her.

249.   University faculty teachers refused to come to Morgan's aid, claiming that they feared retaliation from the University and the Ryan Administration.

250.   Morgan's teachers altered her course of study and her right and ability to attend class, expressing fear that they would be attacked by the mob and the University community.

251.   Morgan and her mother attended the large, impersonal "Final Exercises" doing what they could to hide her identity while maintaining some semblance of normalcy and dignity. Morgan was not invited to her smaller, intimate degree ceremony and would receive her diploma sometime later, in the mail. Also, Morgan was not invited to any University or department graduation celebrations. Not surprisingly, given the hostility fomented against Morgan by the University in its community-wide campaign – and the University's failure to announce Morgan's innocence – Morgan was not invited to any student-led celebrations or parties.

252.   From July 18, 2020, through August 10, 2021, when President Ryan rendered his unconstitutional and racially motivated decision to punish Morgan and note it on her permanent record, but did not officially rescind her degree (nor officially state that her degree would <u>not</u> be rescinded in the future – a power that the University and its administration claim to still possess), through the present, Morgan has awakened each morning with dread, wondering if today will be the day she will be forever banished from the University community and/or her degree withheld, withdrawn, or rescinded.

253.   Today, Morgan is afraid to go out into public. Morgan avoids the "hallowed" Grounds of the once-beloved University for fear of being attacked.

254.   Morgan was fired from a job she held, the employers citing their fear of retaliation by the University and its community if their employment of her was discovered.

255.   Morgan has had a job offer withdrawn once the employer discovered who she was, out of fear of retaliation by the University and its community.

256.    Morgan has had employers convene "risk assessment" meetings to determine if employing her could put the organization at risk of retaliation by the University community.

257.    Morgan has been told by practicing lawyers in Virginia that the likelihood of her being accepted to law school or ever being offered a job in the legal profession – especially the Charlottesville and Albemarle County area, are slim to none.

258.    Morgan has learned that her mother has been harassed at work by co-workers on the basis of her race and the fact that she is a "racist's" mother. Despite notice to the University's EOCR and HR apparatuses, no action to protect or defend Morgan's mother has been undertaken.

259.    Morgan has suffered severe emotional and psychological distress that has continually interrupted and impaired her major life activities and enjoyment of life for 1,107 days and will, to a reasonable degree of scientific and medical certainty, continue well into the future.

260.    Morgan has suffered significant, gruesome, and utterly heartbreaking medical conditions and injuries that are, to a reasonable degree of medical and scientific certainty, directly and proximately caused by and attributable to the University of Virginia's and Defendants Ryan's and Groves' mistreatment of her.

261.    While most students spend their final year of college enjoying their last moments of college life and preparing for the world beyond, Morgan Bettinger's life was consumed with the daily decision of whether to brave the outside world, lest she be "caught" and burned alive in her vehicle; consumed with a multitude of investigations, faculty and student inquisitions, "judicial proceedings and trials," civil rights investigations and interrogations; consumed with the sadness and shame of being an outcast and of having been ostracized;

consumed with the degrading and humiliating knowledge that she was not welcome at social or student events; consumed with the anxiety and anguish that her college career was in tatters and that her dreams of being a lawyer and practicing law in the community would be forever dashed; and, finally, consumed with the deep and pervasive grief stemming from the knowledge that she was innocent of the "crimes" with which she was charged and that no authority or person in power cared or would protect her.

262. Morgan has suffered – and suffered mightily.

263. The Defendant University and Defendants Ryan and Groves ruined Morgan's life.

## V. CAUSES OF ACTION

264. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

### COUNT I
### DISCRIMINATION ON THE BASIS OF RACE
### 42 U.S.C. § 1981
### Equal Protection Clause of the 14th Amendment – 42 U.S.C. § 1983
### Title VI – 42 U.S.C. § 2000d *et seq.*
### *Against All Defendants*

265. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

266. 42 U.S.C. § 1981 prohibits intentional racial discrimination and racial harassment by public universities and public university officials in the context of the student experience and environment, including student discipline and expulsion.

267. The Fourteenth Amendment's Equal Protection Clause, applied to these Defendants by 42 U.S.C. § 1983, prohibits intentional racial discrimination and racial harassment by public universities and public university officials in the context of the student experience and environment, including student discipline and expulsion.

268.   Title VI, found at 42 U.S.C. § 2000d *et seq.*, prohibits intentional discrimination, including disparate treatment and harassment, on the basis of race, color, or national origin in any program or activity that receives federal funds or other federal financial assistance. The University of Virginia receives federal funds and financial assistance and has admitted in other matters and at other times that it falls within the jurisdiction and purview of Title VI.

269.   As alleged above and as hereby alleged anew, the entire sequence of events – from Morgan Bettinger arriving at High Street through President James E. Ryan's intentional decision to violate the United States Constitution on or around August 10, 2021 – was comprehensively and thoroughly perverted, impacted, influenced, tainted, and motivated by race and racial considerations.

270.   None of the events, none of the adverse actions, and none of the mistreatment of Morgan Bettinger would have occurred in the absence of race and/or racial discrimination and/or racial hostility and/or impermissible racial considerations.

271.   But for Morgan Bettinger's race, none of the events, none of the adverse actions, and none of the mistreatment would have occurred. Race is not just the most plausible explanation for the unconstitutional decisions and adverse actions against Morgan Bettinger, it is the only explanation.

272.   In discriminating against Morgan Bettinger on the basis of her race, Defendant The University of Virginia, acting under color of state law, violated the federal anti-race discrimination statute, 42 U.S.C. § 1981, violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as applied to these Defendants by 42 U.S.C. § 1983, and violated Title VI, found at 42 U.S.C. § 2000d *et seq.*

273. In discriminating against Morgan Bettinger on the basis of her race, Defendant Ryan, acting under color of state law, violated the federal anti-race discrimination statute, 42 U.S.C. § 1981 and violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as applied to him by 42 U.S.C. § 1983.

274. In discriminating against Morgan Bettinger on the basis of her race, Defendant Groves, acting under color of state law, violated the federal anti-race discrimination statute, 42 U.S.C. § 1981.

275. From all Defendants except Defendant Groves, the Plaintiff is entitled to prospective injunctive relief regarding the removal and expungement of racially discriminatory taint from her student record, regarding access to and availability of all of the benefits, privileges, terms and conditions attendant to an alumna who has received an untarnished degree, regarding access to and availability of all of the benefits, privileges, terms, and conditions attendant to an alumna whose reputation and character are untarnished and have not been besmirched, including physical safety when on Grounds; and protections from retaliation and/or further physical, emotional, and reputational harm or threats of harm.

276. From Defendant The University of Virginia, the Plaintiff is entitled to recover an award of compensatory damages under Title VI, including but not limited to those damages relating to and regarding the total and irrevocable loss, frustration, denial, and destruction of the benefits, privileges, terms, and conditions of being a student and alumna in good standing who has not been illegally tarnished, besmirched, and sullied in her student records, her reputation, and her character, who has not been illegally constructively suspended and expelled, and who is not in a state of constant fear, shame, and anxiety of being harmed

when she visits or comes to Grounds or goes anywhere the University's influence is present.

277.   From Defendants Ryan and Groves, the Plaintiff is entitled to monetary relief and/or a financial award of compensatory damages for her extensive injuries and economic and non-economic damages and losses.

278.   Because Defendants Ryan's and Groves' acts, errors, and omissions that violated the federal civil rights laws were malicious, intentional, intentionally discriminatory, and racially motivated, an award of punitive damages reflective of their purposeful intent, their willful disregard for Morgan Bettinger's federally protected rights, the extent of the harm they caused the Plaintiff, and the certainty that the Plaintiff would be permanently and forever harmed by their actions is necessary and appropriate.

**COUNT II**
**HARASSMENT & HOSTILE ENVIRONMENT ON THE BASIS OF RACE**
**42 U.S.C. § 1981**
**Equal Protection Clause of the 14th Amendment – 42 U.S.C. § 1983**
**Title VI – 42 U.S.C. § 2000d *et seq.***
***Against All Defendants***

279.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

280.   42 U.S.C. § 1981 prohibits intentional racial discrimination and racial harassment by public universities and public university officials in the context of the student experience and environment, including student discipline and expulsion.

281.   The Fourteenth Amendment's Equal Protection Clause, applied to these Defendants by 42 U.S.C. § 1983, prohibits intentional racial discrimination and racial harassment by public universities and public university officials in the context of the student experience and environment, including student discipline and expulsion.

282.   Title VI, found at 42 U.S.C. § 2000d *et seq.*, prohibits intentional discrimination, including disparate treatment and harassment, on the basis of race, color, or national origin in any program or activity that receives federal funds or other federal financial assistance. The University of Virginia receives federal funds and financial assistance and has admitted in other matters and at other times that it falls within the jurisdiction and purview of Title VI.

283.   The University of Virginia, President James E. Ryan and former Dean of Students Allen W. Groves created, nurtured, fostered, permitted, and encouraged a toxic environment of racial animus and hostility and harassment directed specifically at Morgan Bettinger.

284.   The hostile environment and harassment were unwelcomed, unwanted, subjectively offensive, and objectively offensive.

285.   The abuse and harassment and bullying to which Morgan Bettinger was subjected was on the basis of race, was because of race, was because of her race, and would not have occurred but for her race.

286.   For Morgan Bettinger, as a result of the University's, President Ryan's, and then-Dean of Students' intentional acts, errors, omissions, specifically including their steadfast refusal to protect Morgan, her educational space and environment – her University, her University community, her "place" on "Grounds" – were so severely permeated with discriminatory intimidation, ridicule, and insult that the benefits, privileges, terms and conditions of her educational experience and her relationship with the University of Virginia were irrevocably altered, diminished, impaired, frustrated, and destroyed. The race-based harassment, abuse, bullying, humiliation, intimidation, ridicule, and threats of injury and even death were regular, constant, pervasive, so extraordinarily severe that even in isolation, a hostile educational environment existed as a matter of law.

287.    President Ryan and then-Dean Groves, many members of the Board of Visitors at the time, the Office of University Counsel, the EOCR, the University Police Department, most if not all of the Vice Presidents in the University's organizational hierarchy and structure were personally, consciously aware of the racial hatred and abuse being directed at Morgan Bettinger by members of the University community and the discriminatory decisions and racially hostile environment to which Morgan was being subjected.

288.    In fact, President Ryan's and then-Dean Groves' own acts, errors, and omissions, including their racially discriminatory behavior towards Morgan and disparate treatment of students and employees on the basis of their race proximately, directly, and foreseeably caused, ratified, validated, approved, amplified, and exacerbated the racial hostility being directed at and exhibited towards Morgan.

289.    President Ryan and Dean Groves knew this, and they deliberately refused to protect Morgan.

290.    They purposefully chose not to employ any of the measures that they instituted in other cases, under substantially similar or even identical circumstances for students of a different race. Instead, they intentionally did nothing, knowing that their silence could and in fact did encourage and empower those who sought to destroy Morgan, and knowing that even the smallest, fleeting, and most minimal of efforts by them would have brought about the immediate cessation of the harassment, discrimination, and abuse to which Morgan was being subjected.

291.    And yet, they did nothing to help or protect Morgan, and they refused to take action because of Morgan's race.

292.   In subjecting Morgan Bettinger to a hostile educational environment and harassment on the basis of her race, Defendant The University of Virginia, acting under color of state law, violated the federal anti-race discrimination statute, 42 U.S.C. § 1981, violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as applied to these Defendants by 42 U.S.C. § 1983, and violated Title VI, found at 42 U.S.C. § 2000d *et seq.*

293.   In subjecting Morgan Bettinger to a hostile educational environment and harassment on the basis of her race, Defendant James E. Ryan, acting under color of state law, violated the federal anti-race discrimination statute, 42 U.S.C. § 1981 and violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as applied to these Defendants by 42 U.S.C. § 1983.

294.   In subjecting Morgan Bettinger to a hostile educational environment and harassment on the basis of her race, Defendant Allen W. Groves, acting under color of state law, violated the federal anti-race discrimination statute, 42 U.S.C. § 1981.

295.   As a direct and proximate result of the Defendants' acts, errors, and omissions, the Plaintiff has suffered and will continue to suffer irreparable harm, profound emotional and physical injuries, substantial economic and non-economic losses, and expectation and denial of benefits and privileges damages that will continue well into the future.

296.   From all Defendants <u>except Defendant Groves</u>, the Plaintiff is entitled to prospective injunctive relief reasonably calculated to create and compel access to and availability of all of the benefits, privileges, terms, and conditions attendant to an alumna all of which were denied Morgan as a result of the illegal and unconstitutional harassment on the basis of her race.

297.   From Defendant The University of Virginia, the Plaintiff is entitled to recover an award of compensatory damages under Title VI, including but not limited to those damages relating to and regarding the total and irrevocable loss, frustration, denial, and destruction of the benefits, privileges, terms, and conditions of being a student and alumna in good standing who has not been illegally tarnished, besmirched and sullied in her student records, her reputation, and her character, who has not been illegally constructively suspended and expelled, and who is not in a state of constant fear, shame, and anxiety of being harmed when she visits or comes to Grounds or goes anywhere the University's influence is present.

298.   From Defendants Ryan and Groves, under 42 U.S.C. § 1981, the Plaintiff is entitled to recover monetary relief and/or a financial award of compensatory damages for the profound and heartbreaking injuries and harm she has suffered, including substantial economic and non-economic damages and losses.

299.   Because Defendants Ryan's and Groves' acts, errors, and omissions that violated the federal civil rights laws were malicious, intentional, intentionally discriminatory, and racially motivated, an award of punitive damages reflective of their purposeful intent, their willful disregard for Morgan Bettinger's federally protected rights, the extent of the harm they caused the Plaintiff, and the certainty that the Plaintiff would be permanently and forever harmed by their actions is necessary and appropriate under 42 U.S.C. § 1981.

## COUNT III
### VIOLATION OF THE 1st AMENDMENT
### OF THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983
#### *Against All Defendants Except Defendant Groves*

300.  The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

301.  By operation of the First Amendment to the United States Constitution and its application to states and state actors, such as public universities, by the Fourteenth Amendment, the University of Virginia may not limit, censor, abridge, or, most importantly, discipline or punish a student's speech or for the exercise of free speech. United States Code 42 U.S.C. § 1983 provides the federal statutory framework and vehicle by which aggrieved students at a public university, who have been punished and disciplined purely for their speech and/or the exercise of their free speech, may seek redress.

302.  Even according to the University of Virginia's own written policies and admissions, the University of Virginia "cannot punish a student for uttering words or engaging in speech protected by the First Amendment to the Constitution of the United States."

303.  Morgan Bettinger "uttered words or engaged in speech protected by the First Amendment to the Constitution of the United States."

304.  On August 10, 2021, the University of Virginia and President James E. Ryan punished and continue to punish Morgan Bettinger purely and solely for uttering protected words and engaging in protected speech; for free speech – and for nothing else.

305.  The Defendants have freely and expressly admitted in writing that the adverse actions taken against Morgan Bettinger were based solely and exclusively on the fifteen words she uttered, the speech that she expressed on the evening of Friday, July 17, 2020. The

Defendants have never argued or contended that Morgan Bettinger was punished for anything other than those words.

306. Morgan Bettinger's utterances, words, and speech were protected by the First Amendment and not subject to any recognized exception to Free Speech protections.

307. On August 10, 2021, when Defendant The University of Virginia and Defendant Ryan undertook to punish Morgan Bettinger, they possessed the most complete collection of evidence in the matter and the official conclusions and official findings of the University's multiple investigations, most notably including the University's own professional investigators. From that body of evidence and from President Ryan's vast knowledge and familiarity with constitutional and education law, and armed with not only the opportunity to rely upon the wisdom of the University's own law firm but the comfort of wisdom from his own personal inner circle of supremely talented constitutional scholar-advisors, President Ryan knew, unequivocally, that Morgan Bettinger's speech was free and protected under the First Amendment, that Morgan had been wronged, and that he was intentionally committing the University to violating those sacred rights.

308. The adverse actions taken against Morgan Bettinger on August 10, 2021, punishing, disciplining, and damaging her violated the First Amendment of the United States Constitution and that violation is actionable under 42 U.S.C. § 1983.

309. Morgan Bettinger was unconstitutionally punished and disciplined on August 10, 2021.

310. Morgan Bettinger's permanent and formal student record and transcript were adversely impaired, "marked," and/or "notated" with unconstitutional impairments, notations, and/or demarcations on or after August 10, 2021.

311. The First Amendment violations are continuing and ongoing in nature and the injuries and damages suffered by Morgan Bettinger continue and are ongoing, every day and every day hereafter.

312. As a direct and proximate result of the violation of her First Amendment rights, the Plaintiff has suffered and will continue to suffer irreparable harm, profound emotional and physical injuries, and economic losses and damages that will continue well into the future.

313. In punishing Morgan Bettinger's protected free speech on August 10, 2021, Defendant The University of Virginia, acting under color of state law, violated the First Amendment to the United States Constitution, as applied to these Defendants by 42 U.S.C. § 1983.

314. In punishing Morgan Bettinger's protected free speech on August 10, 2021, Defendant The University of Virginia, acting under color of state law, violated the First Amendment to the United States Constitution, as applied to these Defendants by 42 U.S.C. § 1983.

315. From all Defendants except Defendant Groves, the Plaintiff is entitled to prospective injunctive relief regarding the removal and expungement of unconstitutional taint, negative notations, and any reference to, information about, or mention of this matter.

316. From Defendant Ryan, the Plaintiff is entitled to monetary relief and/or a financial award of compensatory damages for the injuries, harm, and substantial economic and non-economic damages and losses she suffered.

317. Because Defendant Ryan's acts, errors, and omissions that violated the Plaintiff's First Amendment rights were done with full knowledge that they were based on a hoax, with full knowledge and awareness that doing so would certainly violate the Plaintiff's well established, clearly protected federal civil rights, an award of punitive damages reflective of the purposeful intent, the willful disregard for Morgan Bettinger's federally protected

rights, the extent of the harm caused to the Plaintiff, and the certainty that the Plaintiff would be permanently and forever harmed by these actions, is necessary and appropriate. Additionally, because Defendant Ryan's acts, errors, and omissions that violated the Plaintiff's First Amendment rights were intentional and purposeful, were done with the assurance that Morgan's free speech rights were and would be violated, and were undergirded with the stain of racial disparity and discrimination, the acts, errors, and omissions were committed with malice and a willful intent to harm a student under his care and protection, and in wanton disregard of the Plaintiff's clearly established and protected federal civil rights. Therefore, an award of punitive damages is especially warranted in this case.

### COUNT IV
### DECLARATORY JUDGMENT
### 42 U.S.C. § 2201
### *Against All Defendants*

318.  The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

319.  A genuine case and controversy exists between and among the Plaintiff and each Defendant individually and collectively regarding the central questions of whether the Plaintiff's First Amendment rights of Free Speech were violated and whether the Plaintiff was discriminated against and subjected to a hostile environment on the basis of her race.

320.  The facts set forth in this Complaint and described above demonstrate violations of the First and Fourteenth Amendments of the United States Constitution (as made actionable by 42 U.S.C. § 1983), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*, and the substantive federal civil rights statute 42 U.S.C. § 1981.

321.   The Plaintiff is entitled to a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that:

A)   The University of Virginia discriminated against Morgan Bettinger on the basis of race. (42 U.S.C. § 1983, Title VI, and 42 U.S.C. § 1981);

B)   The University of Virginia subjected Morgan Bettinger to a racially hostile educational environment. (42 U.S.C. § 1983, Title VI, and 42 U.S.C. § 1981);

C)   Defendant James E. Ryan discriminated against Morgan Bettinger on the basis of race. (42 U.S.C. § 1983 and 42 U.S.C. § 1981);

D)   Defendant James E. Ryan subjected Morgan Bettinger to a racially hostile educational environment. (42 U.S.C. § 1983 and 42 U.S.C. § 1981);

E)   Defendant Allen W. Groves discriminated against Morgan Bettinger on the basis of race. (42 U.S.C. § 1981);

F)   Defendant Allen W. Groves subjected Morgan Bettinger to a racially hostile educational environment. (42 U.S.C. § 1981);

G)   On August 10, 2021, and continuing until the present, the University of Virginia violated Morgan Bettinger's First Amendment rights of Free Speech. (42 U.S.C. § 1983);

H)   On August 10, 2021, and continuing until the present, Defendant James E. Ryan violated Morgan Bettinger's First Amendment rights of Free Speech. (42 U.S.C. § 1983);

I)   The University of Virginia's  (Title VI, 42 U.S.C. § 1983, and 42 U.S.C. § 1981) and Defendant James E. Ryan's decisions (42 U.S.C. § 1983 and 42 U.S.C. § 1981) that purposefully violated the First Amendment on August 10, 2021, were

motivated by race, because of race, because of the Plaintiff's race, and would not have happened but for the Plaintiff's race, in violation of 42 U.S.C. § 1983, Title VI, and 42 U.S.C. § 1981;

J)    The Plaintiff has suffered irreparable harm that cannot be adequately remedied by legal relief or damages;

K)    The Plaintiff is entitled to an award of compensatory damages against the University of Virginia under Title VI, against Defendant James E. Ryan under 42 U.S.C. §1983 and 42 U.S.C. § 1981, and against Defendant Allen W. Groves under 42 U.S.C. § 1981; and

L)    The Plaintiff is entitled to an award of punitive damages against Defendant James E. Ryan under 42 U.S.C. §1983 and 42 U.S.C. § 1981, and against Defendant Allen W. Groves under 42 U.S.C. § 1981.

**COUNT V**
**INJUNCTIVE RELIEF – PERMANENT INJUNCTION**
**42 U.S.C. § 1981**
**Equal Protection Clause of the 14th Amendment – 42 U.S.C. § 1983**
**Title VI – 42 U.S.C. § 2000d *et seq.***
***Against All Defendants Except Defendant Groves***

322.    The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

323.    Since the Plaintiff seeks prospective injunctive relief only and Defendant Allen W. Groves is no longer employed by the University of Virginia or a member of the University community, the Plaintiff does not seek any purely injunctive relief from Defendant Allen W. Groves.

324.    Prospective injunctive relief tailored to address, correct and remedy ongoing and continuing harms resulting from violations of the United States Constitution and federal

civil rights statutes is a remedy available to the Plaintiff under 42 U.S.C. § 1983, Title VI, and 42 U.S.C. § 1981.

325.   As a result of the violations of the Plaintiff's constitutional and federally protected civil rights, the Plaintiff has been irreparably harmed. The Plaintiff has suffered and will continue to suffer irreparable harm, the constitutional and federal civil rights violations constitute irreparable harm as a matter of law, and no remedy at law is adequate to correct, solve, or cure the harms caused by the unconstitutional and illegal notations and impairments.

326.   From all Defendants except Defendant Groves, the Plaintiff is entitled to prospective injunctive relief regarding and including:

A)   the removal and expungement of unconstitutional taint from her student record;

B)   unfettered access to and full availability of all of the benefits, privileges, terms, and conditions attendant to an alumna who has received an untarnished degree;

C)   unfettered access to and full availability of all of the benefits, privileges, terms, and conditions attendant to an alumna whose reputation and character are untarnished and have not been besmirched, including physical safety when on Grounds; and

D)   competent reasonable protections from retaliation and/or further physical, emotional, and reputational harm or threats of harm.

**COUNT VI**
**COMPENSATORY DAMAGES**
**42 U.S.C. § 1981**
**Equal Protection Clause of the 14th Amendment – 42 U.S.C. § 1983**
**Title VI – 42 U.S.C. § 2000d *et seq.***
***Against Defendants The University of Virginia, Ryan, and Groves***

327.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

328.    Compensatory damages are a measure of relief and remedy available to the Plaintiff for the wrongs alleged in this Complaint against the University of Virginia under Title VI, against Defendants Ryan and Groves under 42 U.S.C. § 1981, and against Defendant Ryan under 42 U.S.C. § 1983.

329.    In the enactment of Title VI, Congress abrogated and eliminated the immunities afforded under the Eleventh Amendment to the United States Constitution to the University of Virginia and similar schools that receive federal funds and/or funding.

330.    Based upon the facts alleged herein, Defendants Ryan and Groves are not entitled to the defense of qualified immunity for their unconstitutional and illegal acts, errors, and omissions.

331.    Therefore, an award of compensatory damages against the University of Virginia, President James E. Ryan, and former Dean of Students Allen W. Groves is a remedy and measure of relief available to the Plaintiff in this case.

332.    The Plaintiff has suffered profound, permanent, and discernible forms of economic and non-economic damages, whether awarded under Title VI damages theories and principles, § 1983 damages theories and principles, and/or § 1981 damages theories and principles, as a direct, proximate, and foreseeable cause and result of the Defendant The University of Virginia's, Defendant Ryan's, and Defendant Groves' unconstitutional and illegal acts, errors, and omissions.

333.    Morgan Bettinger suffered embarrassment, humiliation, ridicule, societal ostracization, and social exile as a direct, proximate, and foreseeable cause and result of Defendant The University of Virginia's, Defendant Ryan's, and Defendant Groves' unconstitutional and illegal acts, errors, and omissions.

334.   Morgan Bettinger has suffered reputational harm and irreversible damage to her reputation and her character as a direct, proximate, and foreseeable cause and result of Defendant The University of Virginia's, Defendant Ryan's, and Defendant Groves' unconstitutional and illegal acts, errors, and omissions.

335.   Morgan Bettinger suffered banishment and exile from her University community, the vaunted University Grounds, and the reasonably expected and anticipated University experience, benefits, privileges, terms, and conditions to which she was entitled and deserved as a direct, proximate, and foreseeable cause and result of Defendant The University of Virginia's, Defendant Ryan's, and Defendant Groves' unconstitutional and illegal acts, errors, and omissions.

336.   Morgan Bettinger suffered severe emotional distress and psychological trauma and injuries as direct, proximate, and foreseeable cause and result of the Defendants' unconstitutional and illegal acts, errors, and omissions.

337.   As a direct, proximate, and foreseeable cause and result of Defendant The University of Virginia's, Defendant Ryan's, and Defendant Groves' unconstitutional and illegal acts, errors, and omissions, Morgan Bettinger suffered emotional, psychological, and psychic injuries including frequent bouts of severe, disabling, and debilitating anxiety, pervasive fear, recurrent feelings of shame and depression, and instances of pure terror, including fear of imminent death or grievous bodily injury.

338.   As a direct, proximate, and foreseeable cause and result of Defendant The University of Virginia's, Defendant Ryan's, and Defendant Groves' unconstitutional and illegal acts, errors, and omissions, Morgan Bettinger suffered physical, tangible personal injuries and

manifestations of emotional distress and psychological trauma, including injuries and conditions that are terrible, life-threatening, gruesome, and heartbreaking.

339. Morgan Bettinger will incur significant and substantial medical and healthcare expenses and costs throughout her lifetime that are the natural, foreseeable consequence of the physical, mental, emotional, and psychological injuries she sustained as a result of Defendant The University of Virginia's, Defendant Ryan's, and Defendant Groves' unconstitutional and illegal acts, errors, and omissions.

340. As a direct, proximate, and foreseeable cause and result of the Defendants' unconstitutional and illegal acts, errors, and omissions, Morgan Bettinger suffered loss of employment, lost wages, loss of future wages, employment and/or job opportunities, loss of advanced schooling and graduate school opportunities, loss of professional education and professional employment opportunities, and other similar economic damages.

341. The Plaintiff is therefore entitled to monetary relief as compensatory damages from Defendant The University of Virginia, Defendant Ryan, and Defendant Groves in compensation for her severe and extensive injuries and the substantial economic and non-economic losses she has and will suffer.

<u>**COUNT VII**</u>
**PUNITIVE DAMAGES**
**42 U.S.C. § 1981**
**Equal Protection Clause of the 14th Amendment – 42 U.S.C. § 1983**
***Against Defendants Ryan and Groves***

342. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

343. President James E. Ryan, armed with the knowledge of the Plaintiff's actual innocence and possessing a vast, thorough, and intimate familiarity with the applicable law, and fully

aware of the devastating effect his decision would have on Morgan Bettinger, the University of Virginia, and the Commonwealth of Virginia, pressed forward and punished the Plaintiff in the harshest of ways and with the most severe of penalties.

344. Defendant Ryan knowingly and intentionally violated Morgan's clearly established constitutional rights of free speech on August 10, 2021.

345. Additionally, Defendant Ryan's acts, errors, and omissions on or around August 10, 2021, were motivated by race, motivated by impermissible racial considerations, motivated by Morgan's race, and would not have been made or omitted "but for" Morgan's race.

346. Evidence of the intentional deprivation of constitutional rights satisfies and serves as evidence of malice. Moreover, discrimination on the basis of race – intentionally depriving a person of a sacred civil right because of race is the ultimate form of malice.

347. Morgan Bettinger's words were clearly protected and her rights clearly established by well-settled law, and Defendant Ryan knew it before he took action against her. President Ryan was fully aware of the consequences of his actions, that he would be violating the United States Constitution and federal civil rights laws, that he would be committing the University of Virginia to a blatant and obvious (and newsworthy) violation of our nation's most sacred rights and principles, and that the acts and omissions against Morgan Bettinger would utterly ruin her.

348. When President Ryan rendered the decisions at issue on or around August 10, 2021, knowing all of this, and undertook the actions to harm and destroy Morgan Bettinger, he:

   A)   possessed a full evidentiary record – not shared with or available to anyone else – that included overwhelming, compelling, and convincing proof of Morgan's actual

innocence and the falsity of the claims against her, and unequivocally demonstrated that the speech for which she was being punished was constitutionally protected;

B)      personally possessed a vast body of education, training, experience, wisdom, and knowledge regarding constitutional law and education law. President Ryan knew and knows that the rights at issue in this matter are clear and well-settled; and

C)      was closely surrounded and personally advised by a select group of lawyers with unprecedented experience, education, and knowledge of constitutional law. This group of five's collective education and experience included five graduates of the University of Virginia's School of Law, three undergraduate degrees from Yale, three United States Supreme Court clerkships, three United States Court of Appeals clerkships, a Dean of Stanford Law School, a multi-term Dean of the University of Virginia School of Law, a President of the University of Pennsylvania, a United States Attorney, a Provost of the University of Virginia, a University Counsel for the University of Virginia, and close to a century of law professorship at the nation's most prestigious law schools teaching constitutional law.

349.     As a result, Defendant Ryan cannot claim ignorance or unawareness of the facts of this matter, Morgan's innocence, the falsity of the claims against her, the precise nature, extent, and contours of the civil rights at issue, the plain truth that his decisions, acts, errors, and omissions were violating those rights, and the simple reality that doing so would harm an innocent young woman for no other reason than the color of her skin.

350.     Based on these facts and circumstances, Defendant Ryan is personally and individually liable under 42 U.S.C. § 1983 and 42 U.S.C. § 1981 and is not entitled to raise or be

considered for the defense of qualified immunity. As a result, Defendant Ryan is liable and should be held responsible for Morgan's significant, substantial, and profound damages.

351.   As a direct and proximate result of Defendant Ryan's purposeful, calculated, and knowing violations of Morgan Bettinger's First Amendment rights, the Plaintiff has suffered and will continue to suffer irreparable harm, profound emotional and physical injuries, and economic losses and damages that will continue well into the future. Defendant Ryan is not entitled to the defense of qualified immunity to evade responsibility for his egregious and reprehensible conduct, and Morgan Bettinger is entitled to an award of compensatory and punitive damages against Defendant Ryan in his personal and individual capacities.

352.   As alleged above, Defendant Groves was equally aware of the facts, the law, and the illegality and unconstitutional nature of his acts, errors, and omissions when he breached his duties to Morgan Bettinger. Defendant Groves purposefully subjected Morgan Bettinger to thirteen months of investigations and three separate processes and adjudications. Defendant Groves knew that Morgan Bettinger's constitutional rights could not and should not have been left to a group of immature University undergraduates, all of whom possessed substantial prejudice against Morgan and bias in favor of their fellow student council member, the teenaged "racial justice" campus celebrity, as well as their President, their Dean of Students, and their University. Defendant Groves knew that the UJC process was unfair, that his involvement was improper, and that the "panel" or "jury" had predetermined a totally illogical and illegal result. Defendant Groves knew that he was violating Morgan's constitutional and federal civil rights when he manipulated the various disciplinary instruments and processes, including his decision to "tee up" Morgan for trial.

353.   Defendant Groves' decisions were motivated by race, motivated by Morgan's race, and but for Morgan's race, he would not have committed the acts against her and refused to take action in her favor. Therefore, Defendant Groves is liable for punitive damages under 42 U.S.C. § 1981. Intentional racial bias and racial discrimination constitute a form of malice and satisfy the intent element necessary for an award of punitive damages.

354.   Because Defendants Ryan's and Groves' acts, errors, and omissions that violated the constitution and federal civil rights laws were intentional and intentionally discriminatory and racially motivated, an award of punitive damages reflective of the extent of the harm they caused the Plaintiff and the certainty that the Plaintiff would be permanently and forever harmed by their actions is necessary and appropriate.

**COUNT VII.**
**ATTORNEYS FEES & COSTS**
**42 U.S.C. § 1988**
***Against All Defendants***

355.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

356.   42 U.S.C. § 1988 allows for an award of attorneys' fees and costs to successful plaintiffs in civil rights matters such as this and therefore, the Plaintiff prays for an award of reasonable attorneys' fees and litigation costs.

**VI. JURY DEMAND.**

357.   The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

358.   The Plaintiff respectfully requests and demands a jury trial on all issues and matters so triable.

## VII. PRAYER FOR RELIEF

359. The Plaintiff hereby incorporates, restates, and re-alleges the preceding paragraphs above as if alleged anew.

360. WHEREFORE, the Plaintiff respectfully prays for, petitions, and requests the Honorable Court to enter Final Judgment in the Plaintiff's favor, including the following award and relief:

A) A Declaratory Judgment in the Plaintiff's favor pursuant to 28 U.S.C. § 2201;

B) An order compelling permanent, prospective injunctive relief in the Plaintiff's favor;

C) An award of compensatory damages, in an amount to be determined by a jury, in the form of monetary relief or financial damages against the University of Virginia pursuant to Title VI and against Defendant Ryan pursuant to 42 U.S.C. §§ 1983 & 1981 and against Defendant Groves pursuant to 42 U.S.C. § 1981 calculated to compensate the Plaintiff for the significant losses, injuries, and lasting damages and harm she has suffered as a result of the Defendants' acts, errors, and omissions;

D) An award of punitive damages against Defendants Ryan and Groves in an amount to be determined by the jury that is calculated to reflect the severity of the harm inflicted upon and damages suffered by Morgan Bettinger and account for the intentional, purposeful, and deliberate nature of these Defendants' decisions, committed with the certainty that Morgan Bettinger's life and future would be ruined;

E) Such other relief as the Court deems just and proper; and

F)      A JURY TRIAL ON ALL ISSUES AND MATTERS SO TRIABLE.


Respectfully submitted, July 28, 2023,

**MORGAN ALYSE BETTINGER**

By her counsel:

/s/ Gregory W. Brown
GREGORY W. BROWN
VA Bar # 36369
BROWN & GAVALIER, PLLC
320 West Main Street
Charlottesville, Virginia 22903
Telephone: (434) 996-2606
Facsimile: (434) 996-2606 (OneTalk)
partners@brownandgavalier.com (Lawyers' Email)
admin@brownandgavalier.com (CM/ECF)
*Counsel for Morgan A. Bettinger*